Kenneth G. CONE Appellant

v.

FAGADAU ENERGY CORPORATION
and Sanford P. Fagadau
Appellees

No. 1–00–00003–CV.

Court of Appeals of Texas,
Eastland.

Dec. 20, 2001.

Rehearing Overruled Feb. 28, 2002.

Michael J. Canon, Canon & Gaston, Midland, Zollie C. Steakley, Rod E. Wetsel, Steakley & Wetsel, Sweetwater, for appellant.

Jim Hund, Murchison, Hund & Herriger, Ralph H. Brock, Lubbock, Dana Cooley, Dist. Atty., Snyder, for appellees.

Panel consists of: ARNOT, C.J., and WRIGHT, J., and McCALL, J.

### Opinion

ARNOT, Chief Justice.

This appeal involves a dispute between parties to an operating agreement executed for the joint operation of a group of oil and gas leases covering approximately 850 acres located in Borden County. Fagadau Energy Corporation (FEC) was the operator of the leases under the operating agreement. Kenneth G. Cone (Cone) was a working interest owner of the leases and a party to the operating agreement. Sanford P. Fagadau (Fagadau) was the president and sole shareholder of FEC. FEC proposed the institution of a water flood program in the mid–1990s for the purpose of obtaining secondary recovery of hydrocarbons from the contract area covered by the operating agreement. FEC also proposed that the contract area be unitized in conjunction with the water flood program. FEC projected a capital cost of approximately $950,000.00 for the installation of the water flood. All of the working interest owners agreed to the water flood and unitization except Cone. Despite Cone's nonparticipation, FEC proceeded with the installation of the water flood and unitization after obtaining approval from the Railroad Commission of Texas. The record reflects that production from the unit increased significantly as a result of the water flood.

Litigation ensued soon after the installation of the water flood. Cone took excep-

tion to various charges made to his account by FEC as production expenses. Cone believed that the charges were improperly assessed to his account in light of his nonparticipation in the water flood. FEC initially filed suit against Cone to obtain a determination of Cone's liability for the payment of the disputed charges. Cone responded by asserting several counterclaims against FEC. Cone also sought to impose personal liability against Fagadau for the claims asserted against FEC.

The majority of the parties' contentions were determined prior to trial by summary judgment and by the granting of special exceptions in FEC's favor. The few remaining issues were decided after a bench trial. Cone appeals each of these adverse rulings by asserting 15 points of error. Cone complains of the trial court's entry of partial summary judgment in his first point of error. His second point of error attacks the granting of a special exception. His third, fourth, fifth, sixth, seventh, eighth, ninth, and tenth points of error attack the trial court's granting FEC's no-evidence motion for summary judgment. These points of error are comprised of numerous subparts, many of which are repetitious. Cone's eleventh point of error consists of four subparts which attack the trial court's no-evidence determination regarding Fagadau's personal liability. Cone's twelfth and thirteenth points of error attack the sufficiency of the evidence to support the trial court's judgment. His fourteenth point of error attacks the imposition of TEX.R.CIV.P. 13 sanctions by the trial court. Cone's fifteenth point of error addresses the awarding of attorney's fees by the trial court. We affirm in part, reverse and render in part, and reverse and remand in part.

The resolution of this appeal requires this court to interpret the parties' operating agreement. The operating agreement was prepared on a form promulgated by the American Association of Petroleum Landmen referred to as the A.A.P.L. Form 610–1982 MODEL FORM OPERATING AGREEMENT. Specifically, this appeal asks the court to interpret the terms of the operating agreement with respect to the following questions: I. Did the conversion of a producing well into an injection well constitute an abandonment of that well? II. Are a non-operator's causes of action against the operator for violations of the operating agreement limited only to actions of gross negligence or willful misconduct? III. Must the operator receive consent from all of the non-operators before installing a water flood?

This appeal also involves questions of the sufficiency of the evidence. These additional questions include: IV. Was Cone's evidence of liability and damages sufficient? V. Did FEC convert Cone's property by withholding Cone's proceeds? VI. Were the sanctions and attorney's fees awarded by the court supported in law and fact? and VII. What is the personal liability of Fagadau, the president of FEC, the operator of the property?

## I. Did the conversion of a producing well into an injection well constitute an abandonment of that well?

■ Cone complains in his first point of error of the trial court's entry of partial summary judgment regarding the conversion of producing wells into water injection wells. The producing wells were converted into injection wells for the purpose of instituting the water flood.[1] Cone con-

---

1. The record reflects that one producing well was converted into an injection well. The record additionally shows that production oc-

curred for approximately one month from a well which was drilled for the purpose of being an injection well in order to clean out

tends that the conversion of the wells constituted abandonment under the terms of the operating agreement such that Cone should have been offered the right to assume control of the wells. Early in the proceedings, the trial court granted FEC's motion for partial summary judgment by ruling that the conversion of the wells did not constitute abandonment under the terms of the operating agreement. Because the construction of a document is a matter of law, we review the trial court's construction of the operating agreement on a de novo basis. See *Matter of Humphreys*, 880 S.W.2d 402, 404 (Tex.), *cert. den'd*, 513 U.S. 964, 115 S.Ct. 427, 130 L.Ed.2d 340 (1994); *JVA Operating Company v. Kaiser–Francis Oil Company*, 11 S.W.3d 504, 506 (Tex.App.—Eastland 2000, pet'n den'd).

▇▇▇ The relevant portion of the operating agreement addressing abandonment of wells is VI.E.2, which is located under the Article titled "DRILLING AND DEVELOPMENT" which reads:

> VI.E.2. *Abandonment of Wells that have Produced:* Except for any well in which a Non–Consent operation has been conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any well which has been completed as a producer shall not be plugged and abandoned without the consent of all parties. If all parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. If, within thirty (30) days after receipt of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue

the formation for injection purposes. Cone's contentions are directed at both of these

its operation from the interval(s) of the formation(s) then open to production shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall assign the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material, all of its interest in the well and related equipment, together with its interest in the leasehold estate as to, but only as to, the interval or intervals of the formation or formations then open to production.

As set forth by the supreme court in *National Union Fire Insurance Company of Pittsburgh, Pennsylvania v. CBI Industries, Inc.*, 907 S.W.2d 517, 520 (Tex.1995):

> The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous. Parol evidence is not admissible for the purpose of creating an ambiguity. ·
>
> If, however, the language of a . . . contract is subject to two or more reasonable interpretations, it is ambiguous. Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. (Citations omitted)

wells.

See also *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983).

We do not construe this provision of the operating agreement as being ambiguous. The operative language of the provision is the phrase "any well which has been completed as a producer shall not be plugged and abandoned without the consent of all parties." Cone does not dispute the fact that the wells have not been plugged. Irrespective of this fact, he contends that the wells in question have been abandoned because the efforts to remove hydrocarbons directly from them have ceased.

■ We disagree with Cone's construction of this provision. "Abandonment" involves a relinquishment of possession. See *Pearson v. Black*, 120 S.W.2d 1075, 1079 (Tex.Civ.App.—Eastland 1938, no writ). The wells had not been abandoned within the ordinary and customary meaning of the term because the wells continued to be utilized on a daily basis for the purpose of water injection. Furthermore, even though hydrocarbons were not produced directly from these wells, the wells were used for the purpose of obtaining production from other wells which produce from the same "interval(s) of the formation(s) then open to production" for which Cone is compensated. As noted by a leading treatise on the subject, "[t]he primary purpose of injecting gas or water into a reservoir is to cause the injected substance to move from the input wells toward the producing wells, driving the oil or wet gas before them." 1 W.L. SUMMERS, THE LAW OF OIL AND GAS § 76 (1954). We note that our holding is consistent with *Osborn v. Anadarko*, 996 P.2d 9 (Wy.2000), a Wyoming Supreme Court case which determined that the conversion of a producing well into an injection well did not constitute abandonment under a farmout agreement. Cone's Point of Error No. 1 is overruled.

In his Points of Error Nos. 3(b) and 7(c), Cone additionally complains of the trial court granting FEC's no-evidence motion for summary judgment by determining that there was no evidence that FEC violated the operating agreement by converting producing wells into injection wells. The determination of this issue turns wholly upon a construction of the operating agreement's abandonment provision which we have addressed in discussing Cone's Point of Error No. 1. Accordingly, Cone's Points of Error Nos. 3(b) and 7(c) are also overruled.

## II. Are a non-operator's causes of action against the operator for violations of the operating agreement limited only to actions of gross negligence or willful misconduct?

■ Cone's second point of error attacks the trial court's granting of a special exception regarding the applicable level of culpability for FEC's alleged violations of the operating agreement. Specifically, the trial court struck Cone's pleadings to the extent they sought to hold FEC liable in any respect for losses sustained or liabilities incurred absent a showing of gross negligence or willful misconduct on the part of FEC. The trial court based its ruling on the following exculpatory provision of the operating agreement set out in V.A. under the Article titled "OPERATOR" which states:

V.A. *Designation and Responsibilities of Operator: [FEC]* shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities

incurred, except such as may result from gross negligence or willful misconduct. In granting the special exception, the trial court held that any complaint made by Cone that was not based on allegations of gross negligence or willful misconduct did not state a cause of action. When a trial court grants special exceptions for failure to state a cause of action, we review that issue of law using a de novo standard of review. See *Pack v. Crossroads, Inc.*, 53 S.W.3d 492, 507 (Tex.App.—Fort Worth 2001, no pet'n h.); *The Butler Weldments Corporation v. Liberty Mutual Insurance Company*, 3 S.W.3d 654, 658 (Tex.App.—Austin 1999, no pet'n).

Cone asserts that he should have been able to assert liability against FEC for alleged breaches of the terms of the operating agreement under a simple breach of contract standard. In this regard, Cone contends that various charges were improperly assessed to his account in violation of the operating agreement. As discussed in detail in Paragraph IV below, Cone protested charges for the purchase of water used in connection with the water flood, the assessment of the non-consent penalty against his interest, and the charging of monthly accounting fees to his account.

In the operating agreement, the language which requires a showing of gross negligence and willful misconduct immediately follows the provision requiring the operator to conduct operations in a good and workmanlike manner. Cone's complaints did not allege the failure of FEC to operate in a good and workmanlike manner. Rather, Cone's complaints alleged breaches of specific terms of the agreement and are in the nature of an account-ing. The operating agreement's accounting procedure exhibit specifically stated the amount that non-operators may be charged for materials.[2] The operating agreement dictated the time within which an election to consent is to be exercised. The COPAS specifically stated the amount that a non-operator may be charged for overhead. The gross negligence/willful misconduct requirement applies to any and all claims that the operator failed to conduct operations in a good and workmanlike manner. The court in *Abraxas Petroleum Corporation v. Hornburg*, 20 S.W.3d 741 (Tex.App.—El Paso 2000, no pet'n), reached a similar result in interpreting this same clause.[3] The trial court erred in striking Cone's allegations for breach of contract.

No judgment may be reversed on appeal unless the court concludes that the error complained of probably caused the rendition of an improper judgment or probably prevented a defendant from presenting the case to the court of appeals. TEX.R.APP.P. 44.1(a). Our review of the record does not indicate that the trial court's ruling on special exceptions resulted in the rendition of an improper judgment. Despite the trial court's granting of a special exception, the record indicates that the trial court heard and determined all of Cone's allegations at the bench trial based on a simple breach of contract standard. Because the error is harmless, Cone's Point of Error No. 2 is overruled.

### III. Must the operator receive consent from all of the non-operators before installing a water flood?

Most of Cone's claims against FEC were denied by the trial court's

---

**2.** This document is typically referred to as a "COPAS" and is so referenced herein.

**3.** The opinion in *Abraxas* was issued after the trial court's judgment was entered in this matter. The trial court did not have the benefit of the *Abraxas* opinion at the time it made its decision.

granting of FEC's no-evidence motion for summary judgment. Cone's Points of Error Nos. 3(a), 7(a), and 7(b) attack the trial court's determination that there was no evidence that Cone's consent was required in order for the water flood to be instituted. The summary judgment evidence offered by Cone in response to the no-evidence motion for summary judgment was the undisputed cost of the project and the operating agreement itself.

■ The trial court must grant a no-evidence motion for summary judgment unless the non-movant produces evidence that raises a genuine issue of material fact on the challenged element of his claim or defense. TEX.R.CIV.P. 166a(i). The appellate court reviews evidence presented in response to a motion for a no-evidence summary judgment in the same way it reviews evidence presented in support of, or in response to, a motion for traditional summary judgment: it accepts as true evidence favorable to the non-movant and indulges every reasonable inference and resolves all doubts in favor of the non-movant. *Hight v. Dublin Veterinary Clinic,* 22 S.W.3d 614, 619 (Tex.App.—Eastland 2000, pet'n den'd); see *American To-*bacco *Company, Inc. v. Grinnell,* 951 S.W.2d 420, 425 (Tex.1997); *Nixon v. Mr. Property Management Company, Inc.,* 690 S.W.2d 546, 548–49 (Tex.1985). The appellate court reviews, however, only evidence presented by the non-movant. Rule 166a(i); *Hight v. Dublin Veterinary Clinic,* supra at 618–19. If the non-movant presents more than a scintilla of evidence on the disputed element, a no-evidence summary judgment is improper. *Hight v. Dublin Veterinary Clinic,* supra; *Denton v. Big Spring Hospital Corporation,* 998 S.W.2d 294, 298 (Tex.App.—Eastland 1999, no pet'n); cf. *Merrell Dow Pharmaceuticals, Inc. v. Havner,* 953 S.W.2d 706 (Tex. 1997), *cert. den'd,* 523 U.S. 1119, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998).

The resolution of the consent issue turns wholly upon a construction of the operating agreement, a determination which is ordinarily considered to be the resolution of a question of law.[4] Cone included the operating agreement as a part of his summary judgment evidence in response to the no-evidence motion for summary judgment. Therefore, the operating agreement is before this court for review because the appellate court only

---

4. At least one court of appeals has held that purely legal issues can never be the subject of a no-evidence motion for summary judgment. *Harrill v. A.J.'s Wrecker Service, Inc.,* 27 S.W.3d 191, 194 (Tex.App.—Dallas 2000, pet'n dism'd w.o.j.). The court in *Harrill* summarily reversed and remanded the trial court's ruling on a no-evidence motion for summary judgment based on a claim of preemption by federal law on the basis that the no-evidence motion for summary judgment was an improper motion to raise the preemption argument.

We do not agree with *Harrill* 's per se reversal and remand of a no-evidence motion for summary judgment that may involve a purely legal issue. Rule 166a(i) provides: "The court must grant the motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact." A fact is material only if it affects the outcome of the suit under the governing law. See *Lampasas v. Spring Center, Inc.,* 988 S.W.2d 428, 433 (Tex.App.—Houston [14th Dist.] 1999, no pet'n). Such a determination can only be made by reliance on the substantive law, and only those facts identified by the substantive law can be considered material. *Lampasas v. Spring Center, Inc.,* supra. Accordingly, the court must determine the law which is applicable to the case with respect to any no-evidence motion for summary judgment in order to determine if the summary judgment evidence raises a genuine issue of material fact. The fact that a dispute exists with respect to the applicable law does not prevent the court from performing its function of analyzing the non-movant's evidence to determine if it raises a fact issue.

reviews evidence presented by the non-movant with respect to a no-evidence motion for summary judgment. *Hight v. Dublin Veterinary Clinic*, supra. We review the trial court's construction of the operating agreement on a de novo basis. See *Matter of Humphreys*, supra; *JVA Operating Company v. Kaiser–Francis Oil Company*, supra.

Cone's consent argument is premised on VII.D.3 of the operating agreement located under the Article titled "EXPENDITURES AND LIABILITY OF PARTIES" which states in relevant part:

> VII.D.3. *Other Operations:* Without the consent of all parties, Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of *Fifteen thousand* Dollars (*$15,000* ) except in connection with a well, the drilling, reworking, deepening, completing, recompleting, or plugging back of which has been previously authorized by or pursuant to this agreement.

Cone asserts that, since the water flood program's initial cost was in excess of $15,000.00, FEC could not install the water flood without his consent. Cone further contends that the installation of the water flood without his consent constituted a breach of the operating agreement.

The relationship between Cone and the other working interest owners of the contract area was that of cotenants of the various leaseholds which comprise the contract area. See *Rankin v. Naftalis*, 557 S.W.2d 940, 946 n. 6 (Tex. 1977). A cotenant has the right to extract minerals from common property without first obtaining the consent of his cotenants. *Byrom v. Pendley*, 717 S.W.2d 602,

605 (Tex.1986); Cox v. Davison, 397 S.W.2d 200, 201 (Tex.1965); *Burnham v. Hardy Oil Co.*, 147 S.W. 330, 335 (Tex. Civ.App.—San Antonio 1912), *aff'd on other grounds*, 108 Tex. 555, 195 S.W. 1139 (1917).[5] This rule is founded on the distinctive legal relationship existing between cotenants: each cotenant has a right to enter upon the common estate and a corollary right to possession. *Byrom v. Pendley*, supra; *Burnham v. Hardy Oil Co.*, supra. As stated by the court in *Burnham:*

> It seems to us that the peculiar circumstances of a cotenancy in land upon which oil is discovered warrant one cotenant to proceed and utilize the oil, without the necessity of the other cotenants concurring. Oil is a fugitive substance and may be drained from the land by a well on adjoining property. It must be promptly taken from the land for it to be secured to the owners. If a cotenant owning a small interest in the land had to give his consent before the others could move towards securing the oil, he could arbitrarily destroy the valuable quality of the land.

The provision upon which Cone relies is contained within a portion of the operating agreement entitled "Limitation of Expenditures." This provision applies to expenditures which the operator may charge to the other owners for activities conducted on the contract area. It provides a means of protecting a non-operating owner from being charged for a large expenditure that exceeds a predetermined amount by essentially giving the non-operating owner veto power over the proposed charge. While this provision appears to limit activities on the contract area, the limitation is only for

---

5. The non-extracting cotenant is not without remedy. The extracting cotenant must account to the remaining cotenants on the basis of the value of any minerals taken, less the necessary and reasonable costs of production and marketing. *Burnham v. Hardy Oil Co.*, supra at 335.

accounting purposes. This provision does not alter the common-law rule of unilateral extraction and development of minerals by cotenants. The provision does not restrict production activities which may be undertaken by the operator on the contract area. This provision is a limitation on the non-operator's exposure to liability for expenses incurred by the operator. This provision does not allow the non-operator to prohibit operations by withholding his consent. Accordingly, the operating agreement did not forbid FEC from installing the water flood without Cone's consent. Cone's Points of Error Nos. 3(a), 7(a), and 7(b) are overruled.

*Texstar North America, Inc. v. Ladd Petroleum Corporation*, 809 S.W.2d 672, 675 (Tex.App.—Corpus Christi 1991, writ den'd), dealt with a similar provision of the typical operating agreement. The provision at issue in *Ladd Petroleum* reads as follows: "2. Rework or Plug Back: Without the consent of all parties, no well shall be reworked or plugged back."[6] The operator proposed for a producing well to be reworked in order to increase its production. The operator interpreted the "rework" provision to mean that it could not rework the well without the consent of all working interest owners. One of the non-operators withheld his consent to the reworking of the well whereupon the operator instituted legal action to compel the non-operator's consent to the proposed reworking.

The court in *Ladd Petroleum* ultimately held that the operator could not compel the dissenting working interest owner to consent to the proposed rework. In reaching this holding, the Corpus Christi Court of Appeals essentially ruled that the well could not be reworked under any circumstances unless all working interest owners agreed to the proposed rework. We disagree with the court's conclusion that the "rework" provision constituted an absolute prohibition against the proposed rework unless all parties consented to the proposal. It appears that the rework provision was contained in the article of an operating agreement entitled "EXPENDITURES AND LIABILITY OF PARTIES." We do not believe that the provision would have prevented the operator in *Ladd Petroleum* from reworking the well without every working interest owner's consent if the operator chose to do so at the expense of itself and of the consenting working interest owners. In this case, the provision would only prevent the operator from trying to charge the non-consenting working interest owner.

## IV. Was Cone's evidence of liability and damages sufficient?

A significant component of the trial court's ruling on FEC's no-evidence motion for summary judgment was the determination that there was no evidence that Cone had suffered any damages with respect to most of the causes of action he asserted. Cone's damage claims fall into two broad categories: (A) damages for future drainage; and (B) claims for charges improperly assessed to his account. Cone asserted numerous theories in an effort to obtain a recovery for these damages.

### A. Damages for Future Drainage

#### 1. Evidence of future drainage

■ With respect to drainage, Cone contends that drainage will occur in the future from a well, known as the HAT No.

---

6. The provision quoted in *Ladd Petroleum* is identical to another provision contained in the article entitled "EXPENDITURES AND LIABILITY OF PARTIES" of the operating agreement at issue in this appeal.

1 well, located approximately 200 feet from the boundary of the contract area. He contends that drainage will occur both from primary production and from the water flood eventually causing hydrocarbons underlying the contract area to be pushed to the HAT No. 1 well. Attached to his response to the no-evidence motion for summary judgment is testimony from a reservoir engineer setting forth an estimate of the amount of drainage which will occur in the future from the HAT No. 1 well.

In *Amoco Production Company v. Alexander*, 622 S.W.2d 563, 568 (Tex. 1981), the court stated the elements for recovery for damages as between lessor/lessee for drainage. A lessor is entitled to recover damages from a lessee for field-wide drainage upon proof (1) of substantial drainage of the lessor's land and (2) that a reasonably prudent operator would have acted to prevent substantial drainage from the lessor's land. The elements would be the same for non-operator and operator. Of course, absent the duty created by the operating agreement, there is no cause of action for drainage as between cotenants as each has the right to capture the minerals. Because any cause for drainage would necessarily include proof by the non-operator that a reasonably prudent operator would have acted to prevent the drainage, it would be difficult, if not impossible, to prove future drainage without proof of present drainage. Cone's expert's affidavit does not offer any evidence that present drainage has occurred. To the contrary, Cone's summary judgment evidence indicated that, as of the date of the summary judgment proceeding, his share of production had benefitted from the water flood. Without evidence of present drainage, Cone's expert's opinion of future drainage is too speculative to raise a fact issue. A party may not recover damages if those damages are remote, contingent, speculative, or conjectural. Cone's Point of Error No. 3(f) is overruled.

## 2. Effect of No Evidence of Damages for Future Drainage

Cone attempted to recover damages for drainage from FEC under theories of breach of contract, willful misconduct, gross negligence, fraud, agency, and breach of fiduciary duty. The trial court ruled that there was no evidence of FEC's liability under any of these theories. Cone attacks each of these rulings on appeal. The trial court also ruled that there was no evidence that Cone had incurred damages as a result of any of these contentions. Our holding that there was no evidence of damages which would result from future drainage is dispositive of several of Cone's points of error. Cone's Point of Error No. 3(d) is overruled because it involves only a claim seeking a recovery for future drainage. The following points of error are overruled to the extent that they involve an attempt to obtain a recovery of damages for future drainage:

Point of Error No. 3(g) (attacking trial court's ruling that there was no evidence of damages as a result of a breach of the operating agreement by FEC);

Point of Error No. 3(h) (attacking trial court's ruling that there was no evidence that any breach of the operating agreement by FEC constituted willful misconduct or gross negligence);

Point of Error No. 4(a) (attacking trial court's ruling that there was no evidence that any act or omission on the part of FEC constituted fraud);

Point of Error No. 4(b) (attacking trial court's ruling that there was no evidence that Cone sustained damages as a result of FEC's alleged fraudulent conduct);

Point of Error No. 5(a) (attacking trial court's ruling that there was no evidence that any act or omission on the part of FEC constituted willful misconduct);

Point of Error No. 5(b) (attacking trial court's ruling that there was no evidence that any act or omission on the part of FEC constituted willful misconduct or gross negligence);

Point of Error No. 5(c) (attacking trial court's ruling that there was no evidence that Cone sustained damages as a result of FEC's alleged willful misconduct);

Point of Error No. 6(a) (attacking trial court's ruling that there was no evidence that any act or omission on the part of FEC constituted gross negligence);

Point of Error No. 6(b) (attacking trial court's ruling that there was no evidence that any act or omission on the part of FEC constituted gross negligence);

Point of Error No. 6(c) (attacking trial court's ruling that there was no evidence that Cone sustained damages as a result of FEC's alleged gross negligence);

Point of Error No. 10(a) (attacking trial court's ruling that there was no evidence that FEC became the agent of the non-operators);

Point of Error No.10(b) (attacking trial court's ruling that there was no evidence of the existence of a fiduciary duty existing between FEC and Cone);

Point of Error No. 10(c) (attacking trial court's ruling that there was no evidence that FEC breached any fiduciary duty it may have owed to Cone); and

Point of Error No. 10(d) (attacking trial court's ruling that there was no evidence that Cone sustained damages as a result of FEC's alleged breach of fiduciary duty).

Additionally, the trial court ruled that there was no evidence of Fagadau's individual liability for Cone's claims. The following points of error are overruled to the extent that they involve an attempt to obtain a recovery of damages for future drainage:

Point of Error No. 11 (attacking trial court's order granting Fagadau's no-evidence motion for summary judgment);

Point of Error No. 11(a) (attacking trial court's ruling that there was no evidence that Fagadau engaged in fraudulent misconduct);

Point of Error No. 11(b) (attacking trial court's ruling that there was no evidence of conduct on the part of Fagadau sufficient to impose personal liability against him); and

Point of Error No. 11(c) (attacking trial court's ruling that there was no evidence that Cone sustained damages as a result of Fagadau's alleged fraudulent misconduct).

### B. Charges Assessed to Cone's Account

### 1. Theory of liability for disputed charges

The other category of damages sought by Cone were for charges which he claimed were improperly assessed to his account. Cone asserted numerous theories to recover these charges, including breach of contract, willful misconduct, gross negligence, and fraud. The trial court subsequently ruled that there was no evidence of FEC's liability under any of the theories asserted by Cone.

With respect to Cone's claims of improper charges, each of his claims arise from specific accounting guidelines set out in the operating agreement. As a general rule, the failure to perform the terms of a contract is a breach of contract, not a tort. *Crim Truck & Tractor Co. v.*

*Navistar International Transportation Corporation*, 823 S.W.2d 591, 597 (Tex. 1992). By disputing the charges assessed to his account, Cone is attempting to obtain the benefit of his bargain as provided by the operating agreement. When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone. *Southwestern Bell Telephone Company v. DeLanney*, 809 S.W.2d 493, 494–95 (Tex.1991) [7]; *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex.1986); see *Abraxas Petroleum Corporation v. Hornburg*, supra at 752–53. Accordingly, Cone's contentions disputing the charges under the operating agreement are to be considered as breach of contract claims and not tort claims. We, therefore, review these disputed charges under a simple breach of contract theory without requiring a showing of gross negligence or willful misconduct pursuant to our construction of the exculpatory provision. Cone's Points of Error Nos. 3(d), 3(h), 4(a), 4(b), 5(a), 5(b), 5(c), 6(a), 6(b), 6(c), 10(a), 10(b), 10(c), and 10(d) are, therefore, overruled because: (1) they involve claims for damages which may be caused by future drainage for which we have found no evidence; and (2) they attempt to obtain a recovery for disputed charges on a basis other than a simple breach of contract standard.

### 2. Monthly Accounting Fee

■■■■ Other than a charge of a monthly accounting fee of $175.00, all of

the disputed charges which Cone addresses in this appeal were decided at trial. As part of its ruling on FEC's no-evidence motion for summary judgment, the trial court ruled that there was no evidence that Cone had been damaged by the assessment of a $175.00 monthly accounting fee by FEC. FEC asserted in its motion that there was no evidence of damage to Cone for the assessment of this charge because it had paid the money back to Cone prior to trial. The appellate court reviews only evidence presented by the non-movant with respect to a no-evidence motion for summary judgment. *Hight v. Dublin Veterinary Clinic*, supra at 618–19. Cone produced summary judgment evidence that a monthly accounting fee of $175.00 had been assessed to his account and that the fee had been improperly assessed. The fact that the charges may have been reimbursed by FEC was not part of Cone's summary judgment evidence. However, Cone acknowledges in his brief that the charges had been reimbursed. He argues on appeal that his summary judgment evidence raised a fact question regarding damages he incurred for the loss of the use of these funds prior to reimbursement. We find that his summary judgment evidence raises a genuine issue of material fact in this regard. Cone's Point of Error No. 3(c) is sustained.

### 3. Charges for Water Purchases

■■■ A bench trial was held on the remainder of Cone's complaints regarding

---

7. In *Formosa Plastics Corporation USA v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41 (Tex.1998), the supreme court addressed an exception to the holding in Southwestern *Bell Telephone Company v. DeLanney*, supra, with respect to claims of fraudulent inducement. Cone has asserted various claims of fraud. However, he does not claim that he was fraudulently induced to enter into an agreement. He contends that FEC fraudulently assessed charges against him under the

operating agreement. The general rule announced in *Crim Truck & Tractor Co. v. Navistar International Transportation Corporation*, supra, that the failure to perform the terms of a contract is a breach of contract, not a tort, governs this action. *Crim Truck & Tractor Co. v. Navistar International Transportation Corporation*, supra at 597; see *Formosa Plastics Corporation USA v. Presidio Engineers and Contractors, Inc.*, supra at 46–47.

charges assessed to his account. The primary disputed charge litigated at trial involved the assessment of fees to Cone's account for the purchase of water used in the water flood. FEC made an agreement with the surface owner for the purchase of water to be used in the water flood. FEC paid the surface owner an initial fee of $10,000.00 for the right to draw water from a water well and agreed to pay 4 cents a barrel for each barrel withdrawn. However, FEC charged Cone's account for the purchase of this water, using a basis of 66.667 cents a barrel.[8] Fagadau testified that he used a basis of 66.667 cents a barrel for charging Cone's interest because it would have cost this amount to truck water to the contract area had FEC been required to do so. FEC did not use this basis in charging the other working interest owners for the purchase of water. Instead, the other working interest owners were charged on the actual cost basis of 4 cents a barrel.

Cone contested the assessment of any charge for the purchase of water on the basis that it was an expenditure arising from the operation of the water flood to which he had not consented. FEC asserted at trial that it was entitled to assess Cone's account on the basis of 66.667 cents a barrel for the purchase of water. The trial court ruled that Cone's account could be charged for the purchase of water but only on the basis of FEC's actual cost of 4 cents a barrel plus his proportionate share of the initial fee of $10,000.00 for the right

to purchase the water. The trial court thus awarded Cone $48,566.00 for water purchase overcharges assessed by FEC.[9] Cone asserts in Point of Error No. 12 that there was no evidence to support the trial court's finding that FEC was entitled to assess any amount for the purchase of water. FEC does not appeal from the trial court's award of $48,566.00 to Cone.

 In order to address the no-evidence argument, we must consider only the evidence and inferences that tend to support the finding, disregarding any evidence or inferences to the contrary. If there is any evidence of probative force to support the finding, the no-evidence point must be overruled. *Juliette Fowler Homes, Inc. v. Welch Associates, Inc.*, 793 S.W.2d 660 (Tex.1990); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951); see also *Merrell Dow Pharmaceuticals, Inc. v. Havner*, supra.

The operating agreement generally states that "all cost and liabilities incurred in operations under this agreement shall be borne and paid . . . by the parties." The COPAS provides that "[m]aterials purchased shall be charged at the price paid by Operator." Evidence was offered at trial to establish that the water flood was instituted and operated upon the recommendation of an expert. Furthermore, the water flood had resulted in a significant increase in production as of the date of trial. We find evidence to support the

8. The evidence showed that Cone's ownership interest in the contract area was approximately 5 percent. FEC calculated the amount assessed to Cone's account for the purchase of water by first multiplying the number of barrels of water purchased by 66.667 cents. FEC then charged Cone's account for approximately 5 percent of this amount in proportion to his ownership interest in the contract area.

9. Even though Cone had disputed the amount of charges assessed by FEC for water purchases, FEC had already collected the charges from Cone by deducting these charges from his proportionate share of production from the contract area. The operating agreement permitted FEC to deduct Cone's proportionate share of expenses from his share of production if Cone did not timely pay his share of expenses. This practice is referred to as "net-checking" in the oil and gas industry.

trial court's determination that the actual cost of water used in operating the water flood was chargeable to Cone's account as an expense incurred "in the necessary and proper conduct of the joint operations." Cone's Point or Error No. 12 is overruled.

### 4. Assessment of non-consent penalty to Cone's account

■ The other remaining charge to which Cone complains on appeal concerns the assessment of a 300 percent "non-consent penalty" to his account for the drilling of a new well. The operating agreement provides a mechanism whereby a party to the agreement could propose the drilling of a new well by submitting a notification to the other parties indicating the proposed location, depth, and cost of the new well. Upon the receipt of such notification, the other parties have 15 days to elect to participate in the proposed well. If a party does not elect to participate in the proposed well, the party is then treated as a non-consenting party with respect to the new well. If the proposed well results in a producing well, the non-consenting party is not entitled to any proceeds resulting from the well's production unless and until those parties consenting to the proposed well recover 300 percent of the cost of drilling the well.

FEC proposed the drilling of a well it referred to as the Clayton–Johnson 22–B2 well/Unit No. 11 well [10] by sending Cone a letter dated March 11, 1996, providing information regarding the proposed location of the well and the reasons why FEC felt the well should be drilled. Attached to the proposal was a geological report and a plat indicating the proposed location for the Unit No. 11 well. These documents indicated that the Unit No. 11 well was intended to serve as an offset to the HAT No. 1 well located approximately 200 feet from the boundary of the contract area.[11] Cone did not elect to participate in the drilling of the Unit No. 11 well. Ultimately, the Unit No. 11 well was not drilled because the Railroad Commission denied FEC application for drilling at the proposed location.

FEC subsequently sent a proposal dated August 30, 1996, to Cone proposing to drill a well identified as the Clayton–Johnson "B" # 3 well/Unit No. 12 well.[12] The proposal included a cover letter, an estimate of the cost to drill the well, and a plat of the Unit No. 12 well's proposed location. The proposal stated that the Unit No. 12 well was to be drilled to a depth of 6,700 feet "which is a depth sufficient to test the Upper Spraberry sand." The proposal informed Cone that he had 15 days to make his election to participate in the drilling of the Unit No. 12 well. FEC followed its proposal of August 30, 1996, with a letter dated September 11, 1996, advising Cone that he had until September 16, 1996, to participate in the drilling of the Unit No. 12 well. Cone did not elect to participate in the drilling of the Unit No. 12 well by September 16, 1996. FEC asserted at trial that Cone's failure to respond within the 15–day period resulted in Cone's interest being subject to the 300 percent non-consent penalty. The trial court ruled that Cone's interest was subject to the non-consent penalty by finding that FEC submitted a proper proposal to which Cone did not timely respond.

---

**10.** We refer to this well as the "Unit No. 11 well" for the sake of clarity.

**11.** The HAT No. 1 well is the same well which we have discussed in addressing Cone's claim of future drainage.

**12.** FEC subsequently referred to this well as the "Unit No. 12 well." We will refer to this well as the Unit No. 12 well for the sake of clarity.

Cone asserts several reasons for arguing that his failure to participate in the drilling of the Unit No. 12 well by September 16, 1996, should not be binding upon him. He argues in his brief that his failure to timely respond to the well's proposal was excused by FEC's material breach of the operating agreement. See *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 692 (Tex.1994). However, it does not appear that Cone asserted this theory in the trial court or sought findings of fact regarding this theory. Accordingly, Cone has not preserved his material breach argument for appellate review. TEX.R.APP.P. 33.1.

Cone additionally cites a letter sent by FEC to Cone dated October 14, 1996, which stated as follows:

> The drilling rig for the "B" # 2 Well will be on location tomorrow, and we will drill to a total depth of 6500 feet to test the Lower Sprayberry section *now* producing in the offset HAT OIL—# 2 ClaytonJohnson. (Emphasis in original)

Cone testified that he believed the letter's reference to the "B" # 2 well, which had been used in the letter of March 11, 1996, when FEC proposed the drilling of the Unit No. 11 well, meant that FEC was reporting on the commencement of drilling the Unit No. 11 well proposed on March 11, 1996. Fagadau testified that the October 14, 1996, letter referred to the Unit No. 12 well which was proposed on August 30, 1996, and that the letter's reference to the "B" # 2 well was a clerical error. Cone also asserts that FEC should have issued a new drilling proposal because the proposed depth and location for the well had been changed. Finally, Cone contends that FEC should have notified him of a decision issued by the Railroad Commission on October 11, 1996, with regard to the HAT No. 1 well. This decision was issued in reference to FEC's application for a minimum spacing exemption for drill-ing the Unit No. 11 well referenced in FEC's proposal of March 11, 1996. The decision contains a finding by the Railroad Commission that the HAT No. 1 well was producing from the same reservoir as the wells covered by the operating agreement. Cone contends that he would have elected to participate in the Unit No. 12 well had he known this information.

We find that the evidence supports the trial court's ruling that Cone was subject to the 300 percent non-consent penalty for the Unit No. 12 well. The events upon which Cone relies occurred after September 16, 1996, the deadline for electing to participate in the drilling of the Unit No. 12 well. Fagadau testified that the reference to the "B" # 2 well in his letter of October 14, 1996, was a clerical mistake and was not intended as a misrepresentation to Cone. The finding by the Railroad Commission regarding the neighboring well was made in reference to the application to drill the Unit No. 11 well proposed on March 11, 1996, rather than the Unit No. 12 well proposed on August 30, 1996. Furthermore, the evidence indicated that a question existed as to whether or not FEC was aware of the Railroad Commission's finding at the time the October 14, 1996, letter was written. Cone's Point of Error No. 13 is overruled.

## V. Did FEC convert Cone's property by withholding Cone's proceeds?

The trial court's ruling on FEC's no-evidence motion for summary judgment involved an additional matter concerning the charges disputed by Cone. He complains in Points of Error Nos. 8(a), 8(b), 8(c), and 8(d) of the trial court's ruling that there was no evidence that FEC had converted Cone's property or that Cone had incurred any damages as a result of the alleged conversion. Cone asserted that FEC had committed conversion by not

crediting the full amount of the proportionate revenue generated by his interest to his account. This claim arises from FEC "net checking" Cone's account by deducting charges which Cone disputed from his share of the revenue generated from production.

 Conversion occurs when one person makes an unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights. *Waisath v. Lack's Stores, Inc.,* 474 S.W.2d 444, 447 (Tex.1971). We find that Cone's summary judgment evidence did not raise a genuine issue of material fact regarding his conversion cause of action. The operating agreement contains a provision whereby Cone and the other non-operators granted FEC a lien on their oil and gas rights in the contract area and a security interest in their respective shares of oil and gas extracted from the contract area. Consequently, Cone authorized FEC's control over his share of production. Moreover, the proceeds attributable to Cone's interest were credited to his account. Cone's dispute centers on deductions made to his account for the charges he disputed. Conversion does not lie for indebtedness that may be discharged by the payment of money generally. See *Newsome v. Charter Bank Colonial,* 940 S.W.2d 157, 161 (Tex.App.—Houston [14th Dist.] 1996, writ den'd); *Estate of Townes v. Townes,* 867 S.W.2d 414, 419 (Tex.App.—Houston [14th Dist.] 1993, writ den'd). Cone's Points of Error Nos. 8(a), 8(b), 8(c), and 8(d) are overruled.

## VI. Were the sanctions and attorney's fees awarded by the court supported in law and fact?

### A. *Sanctions assessed against Cone*

 Cone complains in Point of Error No. 14 of the trial court's order requiring him to pay FEC $65,306.95 as sanctions under TEX.R.CIV.P. 13. FEC sought the recovery of $65,306.95 in its request for the imposition of Rule 13 sanctions. FEC's trial counsel testified that FEC had incurred attorney's fees of $130,613.91 with respect to this matter and that he attributed 50 percent of these fees to the defense of tort claims asserted by Cone. The trial court's final judgment stated as follows:

> [FEC] shall have and recover judgment from [Cone] in the amount of $65,306.95 for attorney's fees, as sanctions under Tex.R.Civ.P. 13. In this regard the Court finds that Counterclaims asserted by [Cone] were groundless and brought for the purpose of harassment. Good cause exists for the imposition of these sanctions because intended harassment was so significant that it was apparent that [Cone's] primary intent in the pursuit of the groundless Counterclaims was to inflict economic harm upon [FEC].

Cone contends that the imposition of sanctions was improper because the trial court failed to comply with the procedural requirements for imposing sanctions under Rule 13.

 The imposition of Rule 13 sanctions is within the discretion of the trial court; thus, we set aside its decision only on a showing of a clear abuse of discretion. See *GTE Communications Systems Corporation v. Tanner,* 856 S.W.2d 725, 730 (Tex.1993); *Texas–Ohio Gas, Inc. v. Mecom,* 28 S.W.3d 129, 135 (Tex.App.—Texarkana 2000, no pet'n). A trial court abuses its discretion when it acts in an unreasonable and arbitrary manner or when it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985), *cert. den'd,*

476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986); *Texas–Ohio Gas, Inc. v. Mecom*, supra at 135.

Rule 13 states that "[n]o sanctions under this rule may be imposed except for good cause, the particulars of which must be stated in the sanction order." When imposing Rule 13 sanctions, the trial court is required to make specific findings of good cause justifying the sanctions. Failure to comply with this clear directive is an abuse of discretion. *Texas–Ohio Gas, Inc. v. Mecom*, supra at 135; *Tarrant County v. Chancey*, 942 S.W.2d 151, 155–56 (Tex. App.—Fort Worth 1997, no writ); *Friedman and Associates, P.C. v. Beltline Road, Ltd.*, 861 S.W.2d 1, 3 (Tex.App.— Dallas 1993, writ dism'd agr.); *Zarsky v. Zurich Management, Inc.*, 829 S.W.2d 398 (Tex.App.—Houston [14th Dist.] 1992, no writ); *GTE Communications Systems Corp. v. Curry*, 819 S.W.2d 652, 653–54 (Tex.App.—San Antonio 1991, no writ); *Kahn v. Garcia*, 816 S.W.2d 131 (Tex. App.—Houston [1st Dist.] 1991, no writ).

Cone contends that the trial court failed to sufficiently set out its findings of good cause justifying the imposition of Rule 13 sanctions. However, Cone did not object to this alleged deficiency of the trial court's order. Cone thereby waived any error regarding the lack of particularized findings in the order imposing sanctions. See TEX.R.APP.P. 33.1; *Texas–Ohio Gas, Inc. v. Mecom*, supra at 135–36; Alexander v. Alexander, 956 S.W.2d 712 (Tex. App.—Houston [14th Dist.] 1997, pet'n den'd); *Land v. AT & S Transportation, Inc.*, 947 S.W.2d 665 (Tex.App.—Austin 1997, no writ); *Campos v. Ysleta General Hospital, Inc.*, 879 S.W.2d 67 (Tex.App.— El Paso 1994, writ den'd); *McCain v. NME Hospitals, Inc.*, 856 S.W.2d 751 (Tex.App.—Dallas 1993, no writ).

Cone also contends that the trial court's failure to conduct a separate evidentiary hearing on the question of imposing Rule 13 sanctions constituted an abuse of discretion. FEC included a request for Rule 13 sanctions in its answer filed in response to Cone's counterclaims. FEC's trial counsel made reference to FEC's request for the imposition of Rule 13 sanctions during his opening statement. The record reveals that evidence was offered on matters bearing on the question of Cone's motivations in pursuing this litigation. We find that the bench trial constituted a hearing on FEC's request for the imposition of Rule 13 sanctions as required by the rule.

Cone asserts in his reply brief that his counterclaims were neither groundless nor brought for the purpose of harassment. Rule 13 authorizes trial courts to impose sanctions against an attorney, a represented party, or both, for filing a pleading that is either: (1) groundless and brought in bad faith; or (2) groundless and brought to harass. *Texas–Ohio Gas, Inc. v. Mecom*, supra at 136; *Emmons v. Purser*, 973 S.W.2d 696, 700 (Tex.App.—Austin 1998, no pet'n); *Monroe v. Grider*, 884 S.W.2d 811, 817 (Tex.App.—Dallas 1994, writ den'd); see also Rule 13; *GTE Communications Systems Corporation v. Tanner*, supra at 730–31. "Groundless" means no basis in law or fact and not warranted by a good faith argument for the extension, modification, or reversal of existing law. Rule 13; *GTE Communications Systems Corporation v. Tanner*, supra at 730. A trial court abuses its discretion by imposing Rule 13 sanctions for claims that are not groundless. *Texas–Ohio Gas, Inc. v. Mecom*, supra at 139.

The trial court's judgment does not enumerate which of Cone's counterclaims it determined to be groundless and brought in bad faith. FEC's request for Rule 13 sanctions cited Cone's tort counterclaims as the basis for its request. We do not

believe that Cone's counterclaims sounding in contract were groundless because the claims asserted specific provisions of the operating agreement which Cone asserted were breached by FEC and were supported by arguable facts. We, therefore, focus our attention on Cone's tort claims.

It is significant to note that the trial court granted FEC's special exception to the extent that Cone could only seek to impose liability against FEC under the operating agreement upon a showing of gross negligence or willful misconduct. The practical effect of this ruling was that Cone was required to allege gross negligence and/or willful misconduct, both of which are causes of action sounding in tort, in order to litigate FEC's alleged breaches of the operating agreement. We have previously determined that the trial court's blanket ruling in this regard was incorrect. It is against this backdrop that we analyze the merits of Cone's tort claims.

Cone alleged causes of action for fraud, willful misconduct, gross negligence, conversion, and breach of fiduciary duty. Under the heading of "FRAUD, WILLFUL MISCONDUCT, AND GROSS NEGLI-GENCE," Cone complained of the following matters: (1) FEC's agreement with a neighboring operator without Cone's knowledge or consent with respect to the location of the HAT No. 1 well; (2) FEC's failure to notify Cone of a determination made by the Railroad Commission regarding the formation from which the HAT No. 1 well was producing; and (3) FEC's mis-identification of a proposed well. Cone also alleged a claim for conversion with respect to oil and gas revenues not credit-

ed to his account. Cone additionally alleged a claim for breach of fiduciary duty against FEC. With respect to the agreement made with the neighboring operator concerning the location of wells, Cone sought to obtain a recovery for future drainage by asserting that FEC had impermissibly waived its right to object to the location of the HAT No. 1 well.[13] In order for the HAT No. 1 well to be drilled, the neighboring operator was required to obtain an exception from the Railroad Commission's minimum spacing require-ments.[14] FEC entered into an agreement with the neighboring operator whereby FEC waived its right to assert an objec-tion to the neighboring operator's applica-tion to the Railroad Commission. The Railroad Commission subsequently grant-ed the neighboring operator's application to drill the HAT No. 1 well closer to the contract area than ordinarily permitted by the Commission's well-spacing rules. Cone asserted that FEC's agreement with the neighboring operator was improper without FEC notifying Cone of either the neighboring operator's application or FEC's agreement to waive objection to the application. We have upheld the trial court's denial of Cone's recovery under this contention on the basis that it sought a recovery for future drainage.

Cone asserted that FEC's agreement with the neighboring operator violated the following provision of the operating agree-ment Article XIV C., titled, COMPLI-ANCE WITH LAWS AND REGULA-TIONS, Regulatory Agencies, which reads as follows:

**13.** We have previously discussed the HAT No. 1 well in addressing Cone's claim for future drainage and the assessment of the non-con-sent penalty for the Unit No. 12 well.

**14.** The Railroad Commission's statewide spacing rules are set out in 16 TEX. ADMIN.

CODE § 3.37 (2001)(Tex. R.R. Comm'n Spacing Rules). An application to drill a well within the Railroad Commission's minimum spacing requirements is commonly referred to as a "Rule 37" application.

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non–Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

Cone included a copy of the written settlement agreement executed by FEC and the neighboring operator in his summary judgment evidence. Our review of the settlement agreement indicates that FEC did not waive any right of Cone or any other party other than FEC's rights as operator. However, there is some authority that FEC possibly had some duty to inform Cone of the neighboring operator's application to drill the neighboring well. The court in *H.G. Sledge, Inc. v. Prospective Investment and Trading Company, Ltd.,* 36 S.W.3d 597, 604–05 (Tex.App.—Austin 2000, pet'n den'd), considered the question of which parties are to be notified upon the filing of an application for a Rule 37 exemption. The court noted that the Railroad Commission considers notice given to the operator as constituting notice to nonoperating mineral interest owners. Accordingly, we find that Cone's contention that FEC inappropriately entered the agreement with the neighboring operator without Cone's knowledge was not groundless.

We have previously addressed Cone's claim regarding FEC's non-disclosure of the Railroad Commission's determination that the HAT No. 1 well was producing from the same formation as the wells located on the contract area in discussing FEC's assessment of the non-consent penalty for the Unit No. 12 well. The Railroad Commission issued a ruling on Octo-

ber 11, 1996, which found that the HAT No. 1 well was producing from the same formation as the wells located on the contract area. Cone contends that FEC should have notified him of this determination because it conflicted with information previously provided by FEC. Specifically, FEC's proposal of March 11, 1996, to drill the Unit No. 11 well included a geological report which stated that the HAT No. 1 well was not producing from the same formation. Cone asserted that he would have participated in the drilling of the Unit No. 12 well had he known of the determination made by the Railroad Commission. We have sustained the trial court's judgment that Cone is subject to the nonconsent penalty for the Unit No. 12 well because the matters alleged by Cone occurred after his deadline for participating in the well had expired. However, we do not find Cone's claims concerning the lack of disclosure of the Railroad Commission's order to be groundless. Even in the absence of a confidential relationship, when one makes a representation, he has a duty to disclose new information when he is aware the new information makes the earlier representation misleading or untrue. *Susanoil, Inc. v. Continental Oil Co.,* 519 S.W.2d 230, 236 n. 6 (Tex.Civ.App.—San Antonio 1975, writ ref'd n.r.e.); see *Anderson, Greenwood & Co. v. Martin,* 44 S.W.3d 200, 212–13 (Tex.App.—Houston [14th Dist.] 2001, no pet'n).

Cone's claim for misidentification of the Unit No. 12 well was also not groundless. Fagadau admitted during his testimony that his letter of October 14, 1996, mistakenly included a well designation which had been used with the previously proposed well. With respect to Cone's claim of conversion, there was evidence that a portion of his share of the production revenues were not credited to his account because of his refusal to pay disputed charges. This

claim had a basis in law and fact because the proceeds of the sale of oil and gas are things that can be converted. See *W.B. Johnson Drilling Company v. Lacy*, 336 S.W.2d 230, 233 (Tex.Civ.App.—Eastland 1960, no writ).

Cone also included a claim for breach of fiduciary duty against FEC. Several cases have addressed the question of whether or not an operator under a similar operating arrangement owes a fiduciary duty to non-operators. See *Rankin v. Naftalis*, supra at 945–46; *Johnston v. American Cometra, Inc.*, 837 S.W.2d 711, 716–17 (Tex. App.—Austin 1992, writ den'd). These cases have routinely held that a joint operating arrangement to develop a particular lease does not in and of itself create a fiduciary relationship. *Rankin v. Naftalis*, supra at 946. These cases have also determined that a joint operating agreement does not necessarily imply the existence of a special relationship between the parties. See *Crowder v. Tri–C Resources, Inc.*, 821 S.W.2d 393, 399 (Tex.App.—Houston [1st Dist.] 1991, no writ); Taylor v. GWR Operating Company, 820 S.W.2d 908, 911–12 (Tex.App.—Houston [1st Dist.] 1991, writ den'd); *Hamilton v. Texas Oil & Gas Corp.*, 648 S.W.2d 316, 320 (Tex.App.—El Paso 1982, writ ref'd n.r.e.). However, these cases have held that a fiduciary relationship may exist if a "special relationship" exists between the parties in the form of a partnership, joint venture, or agency relationship. See *Norman v. Apache Corporation*, 19 F.3d 1017, 1024–25 (5th Cir.1994). Cone asserts that FEC owed him a fiduciary duty by alleging that an agency relationship existed between FEC and the working interest owners. The court in *Johnston* recognized that an operator may owe a fiduciary duty to non-operators if the operator acts as their agent. Accordingly, there was a basis in law for Cone's claim of breach of fiduciary duty.

■ We find that Cone's tort claims were not groundless in that there was some basis in law and fact for their assertion. Simply because Cone could not prove his claims at trial does not mean that they were groundless. As held in *Texas–Ohio Gas, Inc.*, the trial court abuses its discretion by imposing Rule 13 sanctions for claims that are not groundless. We, therefore, sustain Cone's Point of Error No. 14 by reversing the trial court's judgment ordering Cone to pay FEC $65,306.95 as Rule 13 sanctions and render judgment in Cone's favor with respect to the imposition of Rule 13 sanctions.

## B. Cone's Claim for Attorney's Fees

■ Cone complains of the trial court's failure to include an award for attorney's fees in Point of Error No. 15. He contends that the trial court should have awarded him attorney's fees incurred in order to obtain the judgment of $48,566.00 for water charges assessed by FEC under TEX. CIV. PRAC. & REM. CODE ANN. ch. 38 (Vernon 1997). Cone contends that an award of attorney's fees is mandatory under Chapter 38 whenever a party obtains a recovery on a breach of contract claim. See *Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex.1998); *D.F.W. Christian Television, Inc. v. Thornton*, 933 S.W.2d 488, 490 (Tex.1996).

The trial court made the following finding of fact with respect to the recovery of attorney's fees:

4. With regard to the respective claims for attorney's fees:

A. The amount of reasonable and necessary attorney's fees incurred by [FEC] in the successful pursuit of its claims for declaratory relief, as well as in the successful defense of the claims for declaratory relief sought by [Cone] equal and offset the amount of attor-

ney's fees incurred by [Cone] in the successful pursuit of the claims he made against [FEC] in regard to water costs.

Thus, contrary to Cone's contention, the trial court essentially awarded him attorney's fees for obtaining a recovery on his breach of contract claim. However, the trial court completely offset his recovery of attorney's fees by an award of an equal amount of attorney's fees to FEC in connection with the pending declaratory judgment claims. See TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (Vernon 1997). Cone does not complain of the award of FEC's attorney's fees. Cone also does not complain of the amounts of attorney's fees which the trial court awarded in this regard. Furthermore, he does not complain of the offsetting of attorney's fees in this matter.[15] Cone's Point of Error No. 15 is overruled.

## VII. What is the personal liability of Fagadau, the president of FEC, the operator of the property?

■ Cone complains in Points of Error Nos. 11, 11(a), 11(b), and 11(c) of the trial court's determination that there was no evidence of Fagadau's personal liability to Cone. Cone sought to impose personal liability against Fagadau in Fagadau's capacity as the sole shareholder of FEC. Cone acknowledges that TEX. BUS. CORP. ACT art. 2.21 (Vernon Supp.2001) governs causes of action seeking to impose personal liability against shareholders. Article 2.21(A)(2) limits a shareholder's liability for contractual obligations of the corporation and matters related thereto in which the shareholder has used the corporation to perpetrate an actual fraud primarily for the personal benefit of the shareholder.

Cone contends that Article 2.21 does not prohibit his recovery against Fagadau because the acts of fraudulent misconduct he has alleged against FEC were perpetrated by Fagadau.

With the exception of one allegation, all of the fraudulent acts Cone has alleged against Fagadau seek a recovery for his claim of future drainage which might occur from the HAT No. 1 well. We have denied a recovery for future drainage on the basis that the recovery Cone sought was too speculative, and we have denied his Points of Error Nos. 11, 11(a), 11(b), and 11(c) in this regard. The one allegation that does not involve a claim for future drainage is the matter pertaining to the assessment of the non-consent penalty by FEC against Cone's interest for the Unit No. 12 well. Cone contends that the assessment was fraudulent because Fagadau did not inform Cone of the Railroad Commission's determination that the HAT No. 1 well was producing from the same formation.

■ The elements of fraud are: (1) that a material representation was made; (2) that the representation was false; (3) that, when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) that the speaker made the representation with the intent that the other party should act upon it; (5) that the party acted in reliance on the representation; and (6) that the party thereby suffered injury. *Formosa Plastics Corporation USA v. Presidio Engineers and Contractors, Inc.,* 960 S.W.2d 41, 47 (Tex.1998). Fraudulent non-disclosure requires proof of the same elements, including a showing of reliance. *Schlumberger Technology Corporation v. Swan-*

---

**15.** We note that a party's recovery of attorney's fees may be offset against recoveries obtained by the opposing party. See *Satellite*

*Earth Stations East, Inc. v. Davis,* 756 S.W.2d 385 (Tex.App.—Eastland 1988, writ den'd).

*son,* 959 S.W.2d 171, 181 (Tex.1997). We do not believe that Cone's summary judgment evidence raised a genuine issue of material fact with respect to the element of reliance. The injury which Cone contends he suffered as a result of the non-disclosure was his nonparticipation in the drilling of the Unit No. 12 well. The deadline for Cone to participate in the drilling of the Unit No. 12 well expired on or about September 16, 1996. The Railroad Commission's ruling was not issued until October 11, 1996. Thus, even if FEC and/or Fagadau had promptly disclosed the Railroad Commission's ruling to Cone, the deadline for Cone to participate in the Unit No. 12 well had already expired. Cone's Points of Error Nos. 11, 11(a), 11(b), and 11(c) are overruled.

### Conclusion

The trial court's award of Rule 13 sanctions against Cone in the amount of $65,306.95 is reversed, and judgment is rendered for Cone in this regard. The trial court's determination that there was no evidence that Cone suffered any damages as a result of the assessment of a monthly accounting fee of $175.00 is reversed and remanded for further proceedings consistent with this opinion. The remainder of the trial court's judgment is affirmed.[16] FEC's request for sanctions under TEX.R.APP.P. 45 is denied.

---

**16.** Cone complains in Point of Error No. 3(d) that the trial court erred in determining that there was no evidence that FEC withheld funds to which Cone was entitled. He complains in Point of Error No. 3(g) that the trial court erred in determining that there was no evidence that Cone incurred any damages as a result of any breach of the operating agreement which FEC may have committed. These points of error are overruled because:

(1) the matters addressed therein have been considered in discussing his other points of error; and (2) they do not accurately reflect the trial court's final judgment in this cause. Specifically, the trial court's award of $48,566.00 to Cone for improper water charges constituted a determination that FEC had improperly withheld funds from Cone and that Cone had incurred damages as a result of a breach of the operating agreement.