Opinion issued May 8, 2003










 


In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-02-00106-CV
____________
 
IP PETROLEUM COMPANY, INC., Appellant
 
V.
 
WEVANCO ENERGY, L.L.C.; DAVID L. NEAL,
INDIVIDUALLY AND AS ADMINISTRATOR
OF THE ESTATE OF FRANCES NEAL;
MARK SCHOOMAKER; JANE SCHOOMAKER;
BONNIE VAUGHAN; AND MARTIN PHILLIPS, Appellees
 
* * *
 
WEVANCO ENERGY, L.L.C.; DAVID L. NEAL,
INDIVIDUALLY AND AS ADMINISTRATOR
OF THE ESTATE OF FRANCES NEAL;
MARK SCHOOMAKER; JANE SCHOOMAKER;
BONNIE VAUGHAN; AND MARTIN PHILLIPS, Appellants
 
V.
 
IP PETROLEUM COMPANY, INC., Appellee
 

 
 
On Appeal from the 129th District Court
Harris County, Texas
Trial Court Cause No. 99-24160
 

 
 
O P I N I O N
          A jury found that IP Petroleum Company, Inc., appellant, was grossly negligent
when it breached its contract with Wevanco Energy, L.L.C.; David L. Neal,
Individually and as Administrator of the Estate of Frances Neal; Mark Schoomaker;
Jane Schoomaker; Bonnie Vaughan; and Martin Phillips (collectively, “the
plaintiffs”). In 11 points of error, IP argues that it did not breach the contract and the
award of lost profits and attorneys’ fees was improper. The plaintiffs appeal the trial
court’s refusal to award prejudgment interest on purely economic damages. We
reverse and render judgment that the plaintiffs take nothing. 
Factual and Procedural Background
The Kerans Theory
          In 1993, Dr. Don Snyder read a scientific article in an issue of a professional
association bulletin. The article, entitled “Karst-Controlled Reservoir Heterogeneity
in Ellenburger Group Carbonates of West Texas,” was written by a geologist, Charles
Kerans. It proposed an unconventional new approach to drilling for oil in West
Texas. 
          The article was based on a theory of “karsting,” or cave formation, in the
Ellenburger Formation in West Texas. According to the Kerans theory, millions of
years ago, caves were formed in West Texas and were slowly filled with sediment. 
Over time, new rock was formed on top of the caves, collapsing the roofs of the caves
and slowly burying the collapsed caves far below the surface. Kerans theorized that
the buried, collapsed caves created three distinct strata in the Ellenburger
Formation—a “cave roof” zone, a “cave fill” zone, and a “cave floor” zone. Both the
cave roof and cave floor zones contain oil, Kerans opined, but existing wells had
tapped only the oil in the cave roof zone. According to Kerans, if oil wells were
drilled deeper into the Ellenburger Formation, through the cave roof zone and the
unproductive cave fill zone, those wells might produce oil if they tapped into a
productive area of the cave floor zone. 
          The Kerans theory marked a significant departure from the conventional
approach to drilling in the Ellenburger Formation. The conventional approach,
known as the “scratch and sniff” method, was to drill only to the very top of what
Kerans called the cave roof zone and siphon off any oil. The concern was that if a
well was drilled any deeper, it would be inundated by a zone of water. 
The Millard E-2 Well
          Dr. Snyder decided to test the Kerans theory on the Millard E-2 well in the
Penwell Field in Ector County. In 1955, Phillips Petroleum Company had drilled the
Millard E-2 to a total depth of 8600 feet—just a few hundred feet short of where
Kerans theorized the oil-rich cave floor zone might be found. Dr. Snyder believed
that the Millard E-2 presented an opportunity to test the Kerans theory at relatively
low cost. Phillips executed a “farmout agreement” with Dr. Snyder, allowing him to
deepen the well.



The Investors
          Dr. Snyder approached Richard Reeve, the owner of Cleveland Oil Company. 
The two men had previously worked together on several projects. Cleveland Oil paid
Snyder $40,000, and Reeve agreed to have Cleveland Oil find investors in exchange
for a four percent overriding royalty interest. Cleveland Oil did not have to pay any
of the drilling costs, but would receive four percent of the profits. 
          The promotional materials Cleveland Oil sent to prospective investors
indicated that “this is a wildcat test.”


 The materials also indicated that “mechanical
risk is present in re-entries.” This risk disclosure was made because the Millard E-2
had been abandoned for 50 years and it was impossible to predict how badly the well
had deteriorated. 
          Frank Cox, the managing member of Wevanco Energy, L.L.C. had invested
with Reeve in the past, and Cox decided that Wevanco would invest in the Millard
E-2. Cox’s accountant, David Neal, also invested, as did several of Neal’s friends
and family members.
Selection of IP Petroleum
          Snyder, Reeve, and Cox chose IP as the operator of the well. Snyder presented
the proposal to Dr. Mike Senich, a project geologist at IP. Dr. Senich reviewed the
promotional materials and found one sentence in the solicitation letter to be of
particular interest—“Other than for faulting, the Cave Roof is thought to be
reasonably continuous across a field, while the Cave Floor zones are more
heterogeneous much like Permian age rock.” Dr. Senich testified that he understood
this to mean that if the cave floor contained any oil at all, it might be productive in
some areas but unproductive in others. He estimated that the chances of success for
the Millard E-2 were one in ten, or possibly one in five. 
          Scott Nonhof, an engineer, conducted a petroleum engineering analysis on the
well. Nonhof’s handwritten notes indicate: “*Bottom Line - Don’t have any
production data worth a flip. . . . This is a WILDCAT not supported by Production
Data but risk to reward is very high. Supper [sic] low cost to do reentry.”
          IP agreed to participate, and IP and Cleveland Oil signed a participation letter
agreement that described the objective of the project to “deepen the Phillips
Petroleum Millard E #2 from its current TD of 8626' to +/- 9000' to test the
Ellenburger Cave Floor Zone.” IP also agreed to pay 50 percent of the drilling costs,
in exchange for a 50 percent share of the profits if the project were to succeed. 
The Joint Operating Agreement
          Before drilling began, Cleveland Oil, IP, and all the investors executed a
comprehensive Joint Operating Agreement (JOA). The JOA is a form contract
promulgated by the American Association of Petroleum Landmen and is used
throughout the industry. The two provisions of the JOA that are at issue in this case
provide as follows:
[IP, as the operator would] continue the drilling of the well with due
diligence to a depth of 9125' below the surface of the ground or a depth
sufficient to test the Lower Ellenburger Formation, whichever is lesser,
unless granite or other practically impenetrable substance or condition
in the hole, which renders further drilling impractical, is encountered at
a lesser depth, or unless all parties agree to complete or abandon the
well at a lesser depth. 

          . . . .
 
[IP] shall have no liability as Operator to the other parties for losses
sustained or liabilities incurred, except such as may result from gross
negligence or willful misconduct.

The Drilling
          On December 3, 1997, IP began drilling the Millard E-2, and, as warned in the
promotional materials, IP encountered mechanical difficulties that ultimately
increased the costs of drilling to $383,000, instead of $282,625 as originally
projected. IP paid all drilling expenses as they were incurred, expecting a pro rata
reimbursement from the other investors in accordance with the JOA.



          On the evening of December 31, 1997, Reeve, Senich, and Snyder were losing
hope because they were nearing the target depth, and there were no signs of oil. At
about 10 p.m., the mudlogger approached the three men and asked what they wanted
him to do with the oil and gas “shows” in the sample.


 Dr. Senich testified he was
surprised to have had shows at this depth—he thought they had already drilled too
deep and were past the area where he expected to find oil and gas. Likewise, Snyder
testified he thought they had a dry hole “because we had drilled past the point that I
had predicted that we would encounter this lower collapse zone.”


 Dr. Senich
testified that, in general, operators know that it is critical not to drill past the spill
point because, once a well taps into water, it will produce only water and not oil. Dr.
Snyder was convinced, based on the Kerans theory, that the well was already past its
spill point, and Dr. Senich also thought it was too deep. Most of IP’s employees
testified that the Millard E-2 was drilled to a depth sufficient to test the Lower
Ellenburger, but the plaintiffs’ experts testified to the contrary. 
The Agreement to Complete the Well
          The shows were good news, but they presented a dilemma. In order to run a
test and determine whether the shows actually indicated significant quantities of oil,
it would be necessary to set pipe to reinforce the side of the well hole. Setting pipe
would narrow the hole, and because of the depth and the age of Millard E-2, the hole
was narrow already. After a test was run and the hole was narrowed, it would remain
physically possible to deepen the well further, but additional drilling would be
pointless. By then, the well would be so narrow that it would be virtually impossible
to extract oil from the well in paying quantities.


 
          Cox consulted with Neal and then urged Dr. Senich to run the test immediately. 
Dr. Senich testified that Cox and Snyder “wanted to stop immediately” at about the
9000' mark, but Senich wanted to drill a little bit further to allow room for the tools
that test the well. IP ultimately drilled the well to 9015'.
          IP delivered “completion letters” to each investor, which stated in pertinent part
that “IP . . . hereby recommends . . . attempting an open hole completion in the
Ellenburger formation in the interval of 8,947' - 9,010' . . . . Should you elect to
participate, please evidence your election in the space provided.” Each investor
signed the completion letters. Cox, however, testified that he thought the E-2 could
still be deepened if IP had not reached the Lower Ellenburger. David Neal testified
that he signed the letters because he understood them to mean IP had “found the
zone.” 
          The tests indicated that the well would produce three percent oil and 97 percent
water, a mix that would not produce oil in paying quantities. 
The Aftermath
          Upon hearing the test results, Cox demanded that IP drill the well deeper. 
Glynn Broussard, a land man and team leader for IP, testified that Cox refused to take
“no” for an answer and, at one point, Broussard told Cox that “IP felt like we had a
dry hole and it was—we were done and we weren’t going to pursue drilling the well
any deeper. If he wanted to drill the well deeper, he had every right to.” Neither
Wevanco nor any other investor exercised its right under the JOA to take over the
well. Cox, however, testified that IP misled him into believing IP intended to deepen
the well.
          In July 1998, IP gave notice of its intent to plug and abandon the well. In
accordance with the JOA, at that time, the plaintiffs were given an election either to
agree to the abandonment or to disagree and take over the well. The plaintiffs refused
to select either option. Thus, the plaintiffs had at least two opportunities—when the
completion was proposed and when the abandonment was proposed—to deepen the
Millard E-2 themselves and to retain all the profits. They rejected both opportunities. 
          The plaintiffs argued that they had no motivation to produce oil from the
Millard E-2 without a P-4—a regulatory form filed with the Railroad Commission
that allows an operator to sell oil from a well. The P-4 on the Millard E-2 gave IP the
sole authority to sell oil on the well. The plaintiffs contended that IP was
“intentionally holding the rights to the well hostage” until the plaintiffs reimbursed
IP for the drilling expenses it believed it was due under the JOA. 
The Trial
          The plaintiffs sued IP, alleging that IP breached its alleged obligation to further
deepen the Millard E-2; and IP counterclaimed, seeking reimbursement for its drilling
expenses under the JOA. The jury found that IP failed to drill to a depth sufficient
to test the Lower Ellenburger Formation and that the failure was the result of gross
negligence or willful misconduct. The jury also found that IP had breached the
participation letter agreement and that none of the plaintiffs had agreed to the
completion of the wells.
          The jury found that, had IP deepened the Millard E-2 to a sufficient depth, the
plaintiffs would have realized a profit of $534,274. The jury then found that, had the
Millard E-2 been a success, the plaintiffs would have realized an additional profit of
$3,560,000. The jury also awarded $1,424,000 in attorneys’ fees through trial and
$178,000 in appellate attorneys fees. 
JOA Breach
          In issue four, IP asserts that the evidence was legally and factually insufficient
to support the jury’s finding that IP’s alleged failure to drill to a sufficient depth
under the JOA was the result of gross negligence or willful misconduct.
Exculpatory Clause
          The exculpatory clause in the JOA provides that IP “shall have no liability as
Operator to the other parties for losses sustained or liabilities incurred, except such
as may result from gross negligence or willful misconduct.” The plaintiffs contend
that this clause does not apply in breach of contract situations. We disagree.
          Generally, exculpatory clauses in a contract are utilized to exempt one party
from future liability for negligence. See Allright, Inc. v. Elledge, 515 S.W.2d 266,
267 (Tex. 1974). We have found only two cases discussing exculpatory clauses
exempting a party from liability for breach of contract. See Cone v. Fagadau Energy
Corp., 68 S.W.3d 147 (Tex. App.—Eastland 2001, pet. filed); Abraxas Petroleum
Corp. v. Hornburg, 20 S.W.3d 741(Tex. App.—El Paso 2000, no pet.). 
          In Cone, the court was faced with a provision in a JOA identical to the one that
we have before us in this case. See Cone, 68 S.W.3d at 154. In the operating
agreement, the language requiring a showing of gross negligence and willful
misconduct immediately followed the provision requiring the operator to conduct its
operations in a good and workmanlike manner. Id. at 155. Cone’s complaints,
however, did not allege the failure of the operator to operate in a good and
workmanlike manner. Id. Therefore, the Eastland Court of Appeals held that the
exculpatory clause did not pertain to Cone’s breach of contract claims against the
operator. See id.
          In Abraxas, the court determined that an exculpatory clause provision identical
to the one before us was unambiguous. See Abraxas Petroleum Corp., 20 S.W.3d at
759. The court concluded that there was some evidence that the parties did not intend
the exculpatory clause to apply to any and all claims because the clause was placed
in an article which concerned the operator’s authority to conduct operations in the
contract area. Id. More significantly, the operator’s limitation of liability was linked
directly to imposition of the duty to act as a reasonably prudent operator, which
strictly concerns the manner in which the operator conducts drilling operations on the
lease. Id. Accordingly, the El Paso Court of Appeals concluded that the exculpatory
clause was limited to claims based upon an allegation that the operator failed to act
as a reasonably prudent operator and did not apply to a claim that it breached the
JOA. Id.
          Here, in the breach of contract section of their second amended original
petition, the plaintiffs alleged the following:
23.Defendant further breached its agreement with Plaintiffs by
failing to drill and deepen the oil and gas well in question to the
Contract Depth as defined in the Farmout Agreement, Joint
Operating Agreement, and the Participation and Purchase and
Sale Agreement. Specifically, with regard to the contract depth,
Defendant as successor to the Cleveland Oil Company, had the
duty to (1) prosecute the re-entry of the test well to it (sic)
objective depth (as described in Exhibit “A” to the Participation
and Purchase and Sale Agreement) with due diligence and in a
good and workmanlike manner; and (2) accept responsibility for
losses sustained by Plaintiffs resulting from Defendant’s gross
negligence or from breach of its obligations under the
Participation and Purchase Sale Agreement.

Unlike in Cone and Abraxas, the plaintiffs here claimed IP failed to conduct
operations in a good and workmanlike manner; therefore, the exculpatory clauses in
the JOA applied, and the plaintiffs had to establish that IP was grossly negligent or
acted with willful misconduct when it breached the contract.
Standard of Review
          In reviewing a legal sufficiency challenge, we must view the evidence in a light
that tends to support the finding of the disputed fact and disregard all evidence and
inferences to the contrary. Weirich v. Weirich, 833 S.W.2d 942, 945 (Tex. 1992). If
more than a scintilla of evidence exists, the evidence is legally sufficient.
Browning-Ferris, Inc. v. Reyna, 865 S.W.2d 925, 928 (Tex. 1993). To rise above a
scintilla, the evidence offered to prove a vital fact must do more than create a mere
surmise or suspicion of its existence. Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63
(Tex. 1983). In determining legal sufficiency, we consider whether the evidence rises
to a level that would enable reasonable and fair-minded people to differ in their
conclusions. Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 25 (Tex. 1994).
Gross Negligence or Willful Misconduct
          The jury affirmatively answered the following question:
Did IP Petroleum Company, Inc.’s failure to drill to a depth sufficient
to test the Lower Ellenburger Formation result from gross negligence or
willful misconduct?
 
“Gross negligence or willful misconduct” means:
 
(a)a specific intent by IP Petroleum Company Inc. to cause
substantial injury to Plaintiffs; or
 
(b) an act or omission by IP Petroleum Company, Inc.,
 
(i)which, when viewed objectively from the standpoint
of IP Petroleum Company, Inc. at the time of its
occurrence, involved an extreme degree of risk,
considering the probability and magnitude of the
potential harm to others; and
 
(ii)of which IP Petroleum Company, Inc. had actual,
subjective awareness of the risk involved, but
nevertheless proceeded with conscious indifference
to the rights, safety, or welfare of others.


 

This was a significant finding because, under the JOA, for IP to be found liable, the
jury had to have found that IP was grossly negligent or acted with willful misconduct.
          To support a finding of gross negligence, there must be evidence that IP had
“actual subjective knowledge of an extreme risk of serious harm.” Moriel, 879
S.W.2d at 22. The magnitude of the risk is judged from the viewpoint of the
defendant at the time the events occurred. Id. at 23. The harm anticipated must be
extraordinary harm, not the type of harm ordinarily associated with breaches of
contract or even with bad faith denials of contract rights; harm such as “death,
grievous physical injury, or financial ruin.” Id. at 24; Bluebonnet Sav. Bank, F.S.B.
v. Grayridge Apartment Homes, Inc., 907 S.W.2d 904, 911 (Tex. App.—Houston [1st
Dist.] 1995, writ denied).
          Here, the plaintiffs, who were seeking monetary lost profits, summarize the
evidence to support the jury’s finding of gross negligence as follows:
IP apparently did not prepare a written drilling plan for the E-2, which
is the normal procedure, and could not explain its failure to do so.
 
IP got stuck during the drilling operation because of its failure to use
drilling mud and spent over $100,000 trying to get unstuck.
 
IP did not run a drill stem test on the E-2, which many witnesses
testified would be the customary, reasonable and prudent thing to do and
Wevanco’s witnesses testified would have shown that the well was not
in the Lower Ellenburger.
 
IP failed to tell Cox and Wevanco it thought setting pipe would mean
the E-2 could not be deepened if it were not productive.
 
IP told Cox and others that it was considering deepening the E-2 well
when it had absolutely no intention of doing so.
 
IP allowed the farmout to expire while it was still operating, discovered
that fact, and did not do anything about it, requiring Cox to obtain a
second farmout to protect the investors’ rights in the E-2.
 
IP, against the advice of Cox, unsuccessfully attempted to set an
inflatable bridge plug down hole.
 
IP obtained the P-4 on the well, which the jury could reasonably
conclude was at best intended to hold up Wevanco over the issue of the
unpaid drilling expenses and at worst a deliberate attempt to prevent
Cox from deepening the E-2.

          While this may be legally sufficient evidence of negligence, this evidence does
not rise to the level of gross negligence as defined in the jury charge. Nor was there
evidence of willful misconduct. “Throughout the history of Texas law, ‘wilful
misconduct’ has been defined in a manner akin to ‘gross negligence.’” Marshall
Indep. Sch. Dist. v. U.S. Gypsum Co., 790 F. Supp. 1291, 1300 (E.D. Tex. 1992). 
Thus, as the jury instruction indicated, a finding of willful misconduct required
evidence of “a specific intent by IP Petroleum Company Inc. to cause substantial
injury to Plaintiffs.” We hold that the evidence is legally insufficient to support the
jury’s finding. We sustain issue four.
JOA 
          In issue one, IP argues the plaintiffs’ claim for breach of the JOA was without
merit as a matter of law. The JOA states that IP “shall have no liability as Operator
to the other parties for losses sustained or liabilities incurred, except such as may
result from gross negligence or willful misconduct.”
          Having held there was no evidence of gross negligence or willful misconduct,
we sustain IP’s issue one.
          Because we have sustained IP’s issues one and four, which are dispositive of
the plaintiffs’ claims that IP breached the JOA, we need not consider IP’s issues two,
three, five, and six as those issues are moot.
Participation Letter Agreement
          In issue seven, IP contends that Texas law precludes any liability to the
plaintiffs under the participation letter agreement. 
          The jury affirmatively answered the following question:
Did IP Petroleum, Inc. fail to comply with the following agreement?
Deepen the Phillips Petroleum Millard E #2 from its
current TD of 8626' to +/- 9000' to test the Ellenburger
Cave Floor Zone. . . . The well will be deepened from the
depleted Ellenburger Cave Roof, through the dense
Ellenburger Cave Fill interval, then test the objective, the
Ellenburger Cave Floor. 

The “agreement” from which the excerpt was taken was the participation letter
agreement—a contract entered into between IP and Cleveland Oil.


 IP argues that,
for two reasons, this was an improper question to submit to the jury: (1) the plaintiffs
were not parties to the participation letter and cannot seek to enforce it, and (2) the
participation letter agreement was superseded by the JOA.
Parties to the Agreement
          The participation letter agreement was drafted by Cleveland Oil and signed by
a land manager from IP. The plaintiffs contend that they signed essentially identical
agreements with Cleveland Oil, but they were unable to produce any copies of the
signed agreements at trial. They did, however, produce an unsigned copy which was
admitted into evidence. 
          Generally, a plaintiff may not enforce a contract to which he is not a party. 
Stine v. Stewart, 80 S.W.3d 586, 589 (Tex. 2002). However, a third party may
recover on a contract made between other parties only if the parties intended to secure
a benefit to that third party, and only if the contracting parties entered into the
contract directly for the third party’s benefit. Id. “The intention to contract or confer
a direct benefit to a third party must be clearly and fully spelled out or enforcement
by the third party must be denied.” MCI Telecomm. Corp. v. Texas Utils. Elec. Co.,
995 S.W.2d 647, 651 (Tex. 1998). Any doubt is resolved against a finding that the
party was intended to be a third-party beneficiary. Mandell v. Hamman Oil & Ref.
Co., 822 S.W.2d 153, 161 (Tex. App.—Houston [1st Dist.] 1991, writ denied). To
determine the parties’ intent, courts must examine the entire agreement when
interpreting a contract and give effect to all the contract’s provisions so that none are
rendered meaningless. Stine, 80 S.W.3d at 589.
          Shortly after IP signed the participation letter agreement with Cleveland Oil,
Richard Reeve, Cleveland Oil’s owner, sent IP a letter outlining the “burden
clarification of the [Penwell] prospect (as described in that participation agreement
dated 10/31/97 between The Cleveland Oil Company, L.L.C. . . . and IP. . . .).” In this
letter, Reeve explains that “IP shall serve as Operator. IP will maintain the same
spirit of operations as would Cleveland, where the Operator is operating for the
benefit of all parties . . . .” Stephen Guidry, IP’s land manager, signed this burden
clarification. We hold that this clarification indicates that the plaintiffs were third-party beneficiaries of the participation agreement between IP and Cleveland Oil. 
JOA
          IP argues that the participation agreement was superceded by the JOA because
the two agreements contain inconsistent drilling obligations and gross negligence
provisions. 
          Instruments pertaining to the same transaction may be read together to ascertain
the parties’ intent, even if the parties executed the instruments at different times. Ft.
Worth Indep. Sch. Dist. v. City of Ft. Worth, 22 S.W.3d 831, 840 (Tex. 2000). Only
when the terms of one contract are so inconsistent with those of the other that the two
cannot subsist together is there a presumption that the second superceded the first. 
Willeke v. Bailey, 189 S.W.2d 477, 479 (Tex. 1945).
          We must examine the two agreements and their respective drilling obligations.


Participation Letter Agreement

JOA



“Deepen the Phillips Petroleum
Millard E #2 from its current TD of
8626' to +/- 9000' to test the
Ellenburger Cave Floor Zone.” 

“[IP] shall thereafter continue the
drilling of the well with due diligence
to a depth of 9125' below the surface
of the ground or a depth sufficient to
test the Lower Ellenburger Formation,
whichever is lesser . . . unless all
parties agree to complete or abandon
the well at a lesser depth.”



 
The participation letter agreement only addresses drilling to a depth necessary to test
the Ellenburger Cave Floor Zone. The JOA, however, authorized IP to stop drilling
at 9125' even if it believed it had not yet reached the Lower Ellenburger Formation. 
Furthermore, the JOA authorized IP to stop drilling at a lesser depth if all parties
agreed to complete or abandon the well.
          The letter agreement does not allow a consensual completion of the drilling at
any point above the Ellenburger Cave Floor Zone. If the parties had signed the
completion letters with the understanding that IP had not yet reached the Ellenburger
Cave Floor Zone, IP would have been in violation of the participation letter
agreement. As such, the two agreements contain mutually inconsistent terms.
          We hold that the JOA superseded the participation letter agreement.
          We sustain issue seven. 
          In issue eight, IP argues that, even under the participation letter agreement, it
is not liable to the plaintiffs.
          Having held that the JOA superseded the participation letter agreement, issue
eight is moot.
Damages
          In issue nine, IP asserts that the plaintiffs failed to establish lost-profits
damages with “reasonable certainty” where the lost profits damages were based on
(1) a “wildcat” prospect drilled to test a new and unproven scientific theory and (2) 
seven additional hypothetical wells. In issue 10, IP contends that the trial court erred
by awarding attorneys’ fees to the plaintiff. In issue 11, IP argues that the trial court
erred by awarding prejudgment interest to the plaintiffs.
          Having held that there was legally insufficient evidence to establish that IP
breached the JOA, and having held that the JOA superceded the participation letter
agreement, we hold that the plaintiffs are not entitled to damages, attorneys’ fees, or
prejudgment interest.
          We sustain issues 9, 10, and 11.
Future Damages
          In their sole point of error, the plaintiffs argue that the trial court erred when
it refused to award prejudgment interest on the future damages awarded for lost
profits.
          Damages, in this case, are contingent on the breach of contract finding. We
have held there was legally insufficient evidence to establish that IP breached its
contract.
          We overrule the plaintiffs’ sole point of error.
Conclusion
          We reverse the judgment of the trial court and render judgment that the
plaintiffs take nothing. We affirm the remainder of the trial court’s judgment.



                                                                        George C. Hanks, Jr.
                                                                        Justice

Panel consists of Chief Justice Radack and Justices Nuchia and Hanks.