# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00479-CV

### R & R Resources Corporation, Appellant

### v.

### Echelon Oil and Gas, L.L.C.; Tex-El Oil and Gas, Inc.; and BairTex Energy, Inc., Appellees

### FROM THE DISTRICT COURT OF FAYETTE COUNTY, 155TH JUDICIAL DISTRICT NO. 2005V-107, HONORABLE DAN R. BECK, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This is an accelerated appeal from an order granting a temporary injunction. R & R Resources Corporation is the operator and a working interest[1] owner of three oil and gas wells—the Ullrich, Goebel Brothers, and Toennis—located in Fayette County. Echelon Oil and Gas, L.L.C., Tex-El Oil and Gas, Inc., and BairTex Energy, Inc. are also working interest owners. R & R Resources appeals a temporary injunction entered against it that prevents it from opposing the designation of Leexus Oil & Gas, L.L.P. as the new operator of the Ullrich and Goebel Brothers wells. R & R Resources challenges the trial court's order as an abuse of discretion, arguing that the

---

[1] A "working interest" is the operating interest under an oil and gas lease that is subject to all costs of exploration and development. 8 Patrick H. Martin & Bruce M. Kramer, Williams & Meyers Oil and Gas Law, Manual of Terms 1191 (2004).

order violated the rules of equity and that Echelon, Tex-El, and BairTex did not demonstrate standing to seek injunctive relief, a probable right of recovery, or irreparable injury. R & R Resources's reply brief added two issues: (i) that R & R Resources was denied an opportunity to be heard at a subsequent status hearing on September 9, 2005, and (ii) that the trial court's order was impermissibly speculative. Because we find that the trial court did not abuse its discretion by granting the temporary injunction, we affirm the trial court's order.

## BACKGROUND

Echelon, Tex-El, and BairTex are in the business of purchasing and selling interests in oil and gas producing properties. As part of this business, Echelon, Tex-El, and BairTex purchased certain working interests in the Ullrich, Goebel Brothers, and Toennis oil and gas wells.[2] The parties operate the wells under two identical joint operating agreements, the 1989 American Association of Petroleum Landmen Form 610 Model Form Operating Agreements. These forms are agreements between oil and gas lease owners and interest holders for the exploration and development of oil and gas within the "contract area" described in the agreements. The agreements in this case designate R & R Resources as the "Operator," that conducts, directs, and controls operations in the contract area. All other parties to the agreements—Echelon, Tex-El,[3] and BairTex—are designated as "Non-Operators."

---

[2] While these working interest owners bear the costs of exploration and development, they also own a share of the production of oil and gas from the wells.

[3] Tex-El Oil and Gas, Inc. was previously known as Raytex Energy, Inc.

The parties conducted business through their respective corporate presidents: Frederick Doutel, Jr. of R & R Resources, Roger Slayton of Tex-El, Randal Snider of Echelon, and Warren Bair of BairTex. On November 14, 2003, after Slayton complained to Doutel about R & R Resources's operations and accounting procedures concerning the wells, Doutel sent an e-mail offering to arrange for Slayton to "take over operations on [the] Goebel, Ullrich and/or Toennis" wells "th[at] afternoon." Later that day, Doutel sent another e-mail to Slayton stating, "Sorry, we'll do it December 1st. You will be the operator."

Shortly afterward, Slayton sought to audit R & R Resources's books and requested that, at the completion of the audit, the parties sign the Texas Railroad Commission's P-4 forms that would change the operator to Echelon.[4] On November 24, 2003, Doutel wrote a letter to Slayton, copied to Snider and Bair, stating that R & R Resources would convey operations of the Ullrich and Toennis wells but would retain operation of the Goebel Brothers well. His letter also stated that R & R Resources was "working up a letter agreement regarding conditions for operator transfer," including a requirement that the new operator use particular vendors. Tex-El, Echelon, and BairTex audited R & R Resources's books in December 2003, but afterward Doutel did not sign the P-4 forms.

Unsuccessful in its attempts to have R & R Resources transfer operation of the wells, Echelon, Tex-El, and BairTex retained counsel. Their attorney wrote to Doutel on April 30, 2004, advising that his clients, who were "majority interest" owners in the three wells, had voted to remove

_____

[4] Slayton's letter to Doutel stated that Echelon was in the process of obtaining an operator number from the Texas Railroad Commission so that Echelon could take over operation of the wells.

R & R Resources as operator for "good cause" pursuant to the joint operating agreements' terms. The letter proceeded to list the ways in which R & R Resources had "failed and refused to act as a reasonably prudent operator." Counsel's letter also demanded that R & R Resources: (i) relinquish operation of the wells to a new operator to be designated by Echelon, Tex-El, and BairTex, and (ii) pay a refund owed to them. Doutel's May 28 response letter denied the request to relinquish operation of the wells and stated that he had instructed his accountant to remit the funds due to Echelon, Tex-El, and BairTex within ten days.[5] Doutel's response did not address the other allegations in counsel's letter. Bill Jaehne of Leexus Oil & Gas also called Doutel to ask whether he would turn the operations over to Leexus, but Doutel refused.

Almost four months after sending its demand letter, Echelon, Tex-El, and BairTex (collectively, the "Non-Operators") requested the Texas Railroad Commission's approval of single-signature P-4 forms designating Leexus Oil & Gas, L.L.P. as the new operator of the three wells. The request explained that, although R & R Resources had been removed as operator under the terms of the joint operating agreements because of its "operational and/or billing discrepancies," R & R Resources refused to cease operations and transfer the P-4s to another operator. The Commission requested a response from R & R Resources in support of R & R Resources's good faith claim to operate the leases. It noted that R & R Resources was not required to refute Leexus's

---

[5] At the temporary injunction hearing, Slayton testified that the refunds were not paid until about sixty days after R & R Resources's letter, which was seventeen months after the well was drilled.

good faith claim but only to substantiate R & R Resources's own good faith claim to operate the wells.

On November 19, 2004, after R & R Resources responded with copies of the wells' leases and operating agreements, the Commission informed the parties that "[w]hether Leexus is entitled to become the designated operator of the subject leases appears to turn on the question of whether the owners of a majority of the working interest in the leases had the right to remove R & R Resources as operator." The Commission stated that it lacked jurisdiction to construe the terms of the operating agreements, determine what constituted "good cause" for removal under the agreements, and otherwise determine the parties' contractual rights. Accordingly, it deferred these determinations to the courts and declined to process the single-signature P-4s.

The Non-Operators filed suit against R & R Resources on May 18, 2005, and sought a temporary injunction. On July 1, 2005, after a two-day hearing held on June 15 and 17, the trial court entered an order preventing R & R Resources from opposing the designation of Leexus as the operator of the Ullrich Lease and Goebel Brothers Lease.[6] In summary, the order enjoined R & R Resources from

- refusing to join in the immediate execution and delivery of proper joint form P-4s designating Leexus as the operator for and of the Ullrich Lease and Goebel Brothers Lease;

- interfering, opposing, preventing or refusing to cooperate with Plaintiffs' and/or Leexus's efforts to file and obtain approval from the Texas Railroad Commission of joint form P-4s

---

[6] The temporary injunction order was inapplicable to the Toennis well. The record shows that, of the three wells in the underlying suit, the Toennis is the only well that is not expressly covered by a joint operating agreement.

designating Leexus (for Commission purposes) as the operator of the Ullrich Lease and Goebel Brothers Lease;

- further operating or performing operations on the Ullrich Lease and Goebel Brothers Lease following the Commission's approval of the joint form P-4s;

- interfering, opposing, preventing or refusing to cooperate with Leexus's operation of the Ullrich Lease and Goebel Brothers Lease, following the Commission's approval of the joint form P-4s; and

- refusing to deliver to Leexus—upon the Commission's approval of Leexus's joint form P-4 operator status for the Ullrich Lease and Goebel Brothers Lease—the well files, records, data, and all other documentation relating to the previous operation of the leases or necessary to continue the operation of the leases.

The trial court entered findings of fact and conclusions of law concerning the temporary injunction. When R & R Resources did not comply with the injunction, the Non-Operators sought this Court's emergency enforcement of the order pending resolution of R & R Resources's interlocutory appeal. We granted the motion.

After R & R Resources did not comply with our order enforcing the trial court's temporary injunction, the Non-Operators filed a motion for contempt, and R & R Resources filed a motion for reconsideration of our order based on an *in camera* inspection of documents that the trial court was to begin on or about November 4, 2005. We have not received any order that the court may have entered during or subsequent to the pretrial hearing on October 12, 2005. We referred enforcement of this Court's order to the trial court for findings and recommendations concerning R & R Resources's compliance with our order enforcing the trial court's order. *See* Tex. R. App. P. 29.4(b); *In re Sheshtawy*, 154 S.W.3d 114, 124-125 (Tex. 2004). We have not received the trial court's findings and recommendations. Jury trial is set for January 18, 2006, to determine

6

whether the Non-Operators are entitled to declaratory relief and damages for R & R Resources's alleged breach of the joint operating agreements' terms governing the accounting and operation of the wells.

## ANALYSIS

### Standard of Review

The purpose of a temporary injunction is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). Injunctions may also issue when the status quo is not a condition of rest but of action, because the condition of rest will inflict irreparable injury on the complainant. *RP&R, Inc. v. Territo*, 32 S.W.3d 396, 401 n.3 (Tex. App.—Houston [14th Dist.] 2000, no pet.). To obtain a temporary injunction, the applicant must plead and prove a cause of action against the defendant, a probable right to the relief sought, and a probable, imminent, and irreparable injury in the interim. *Butnaru*, 84 S.W.3d at 204.

The decision to grant or deny a temporary injunction lies within the sound discretion of the trial court, and we will not disturb that decision absent a clear abuse of discretion. *Id*. at 204. This Court may neither substitute its judgment for that of the trial court nor consider the merits of the underlying lawsuit; we consider only the validity of the order. *Universal Health Servs., Inc. v. Thompson*, 24 S.W.3d 574, 576 (Tex. App.—Austin 2000, no pet.); *see also Tom James of Dallas, Inc. v. Cobb*, 109 S.W.3d 877, 884 (Tex. App.—Dallas 2003, no pet.). Viewing the evidence in the light most favorable to the trial court's order and indulging every reasonable inference in its favor,

7

we determine whether the order was so arbitrary as to exceed the bounds of reasonable discretion. *Universal Health Servs.*, 24 S.W.3d at 576; *Tom James of Dallas*, 109 S.W.3d at 883. If the court heard conflicting evidence and the record contains evidence that reasonably supports its decision, we will affirm the order. *Universal Health Servs.*, 24 S.W.3d at 576; *see also Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978).

In an interlocutory appeal such as this, a trial court may file findings of fact and conclusions of law, but it is not required to do so. Tex. R. App. P. 28.1; *Tom James of Dallas*, 109 S.W.3d at 884. While findings and conclusions may be helpful in reviewing for an abuse of discretion, they do not carry the same weight as findings made after a trial on the merits and are not binding when we are reviewing a trial court's exercise of discretion. *Tom James of Dallas*, 109 S.W.3d at 884 (citing *IKB Indus., Ltd. v. Pro-Line Corp.*, 938 S.W.2d 440, 442 (Tex. 1997); *Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 852 (Tex. 1992)).

**Standing**

In its first issue, R & R Resources contends that Echelon, Tex-El, and BairTex lacked standing to request the temporary injunction because they lack any direct ownership in the wells at issue. R & R Resources quotes language in the joint operating agreements that permits removal of the operator "by the affirmative vote of Non-Operators owning a majority interest." But the testimony at the temporary injunction hearing revealed that, although Echelon, Tex-El, and BairTex sold portions of the working interests that they had purchased, they also reserved portions of those oil and gas interests for themselves.

Additionally, Slayton and Bair testified that Echelon, Tex-El, and BairTex owned a majority of the working interest in the wells through participation or subscription agreements with their respective investors that had delegated decision-making and voting authority over their interests to Echelon, Tex-El, and BairTex.  Slayton testified that Tex-El and its investors own 20% of the working interest in the Ullrich well and 15% of the working interest in the Goebel Brothers well.  The parties, including R & R Resources, stipulated to the testimony concerning BairTex's and Echelon's interests in the wells.[7]  With regard to the Ullrich well, the parties stipulated to the testimony that BairTex and its investors own 12.40% of the working interest while Echelon and its investors own 36.20% of the working interest.  The parties further stipulated to the testimony that, with regard to the Goebel Brothers well, BairTex and its investors own 10% of the working interest while Echelon and its investors own 37% of the working interest.  The parties also stipulated to the testimony that Echelon, Tex-El, and BairTex—along with their investors who purchased a portion of the working interests—collectively owned 69% of the total working interest in the Ullrich well and 62% of the total working interest in the Goebel Brothers well.

R & R Resources next contends that it had a statutory right to determine the identities of Echelon's, Tex-El's, and BairTex's investors and obtain their opinions on the lawsuit.  *See* Tex. Nat. Res. Code Ann. § 91.141(b) (West 2001).  Its understanding of section 91.141 of the natural resources code entitles "any stockholder, or shareholder, or royalty owner *in an oil well*" to inspect the records of any owners and operators of oil and gas wells.  But that section of the code states that

---

[7] R & R Resources stipulated that these statements constituted a proffer of two witnesses' testimony, but it did not stipulate to the numbers.

"[t]he books shall be kept open for inspection of the commission or any accredited representative of the commission and any stockholder, shareholder, or royalty owner *in the business*." *Id.* (emphasis added). This statute requires Echelon, Tex-El, and BairTex each to keep its books open for its own stockholders, shareholders, and royalty interest owners. R & R Resources does not cite any authority for its contention that the books must be opened to "any stockholder, or shareholder, or royalty owner *in an oil well*," other than its interpretation of excerpts from section 91.141 of the natural resources code. We do not find its argument under section 91.141 persuasive.

R & R Resources's reliance on a contractual right to disclosure under the joint operating agreements is similarly misplaced. It asserts that paragraph V.B.2 of the joint operating agreements entitles it to determine whether Echelon, Tex-El, and BairTex conducted a valid vote or polling of their investors prior to removal of the operator. Paragraph V.B.2 of the agreements states that the successor operator shall be selected by the affirmative vote of two or more parties owning a majority interest. As previously noted, there was testimony at the hearing that Echelon, Tex-El, and BairTex owned a majority of the working interest in the wells through participation or subscription agreements with their respective investors and that each of these agreements delegated decision-making and voting authority over their interests to Echelon, Tex-El, and BairTex.

The trial court found that "Plaintiffs [Echelon, Tex-El, and BairTex] own or, by virtue of written agreements with their respective investors, exclusively control (including all voting and decision making rights) a majority of the working interest" in the Ullrich and Goebel Brothers leases. The court further found that in April 2004, plaintiffs notified R & R Resources of their affirmative vote to remove R & R Resources as operator of the three leases. Because there was some evidence

10

adduced at the hearing that Echelon, Tex-El, and BairTex have direct ownership in the Ullrich and Goebel Brothers wells, that their interests combined with those of their investors constituted a majority, and that they affirmatively voted to remove R & Resources as operator, we do not find that the court abused its discretion in determining that Echelon, Tex-El, and BairTex had standing to request a temporary injunction. We overrule R & R Resources's first issue.

**Probable, Imminent, and Irreparable Injury**

In its second issue, R & R Resources argues that the trial court abused its discretion in finding "irreparable injury" because Echelon, Tex-El, and BairTex did not establish that they would sustain imminent, irreparable injury without the entry of a temporary injunction. R & R Resources also argues that the Non-Operators have an adequate legal remedy in the form of a contractual suit for damages. Probable injury includes elements of imminent harm, irreparable harm, and lack of an adequate remedy at law for damages. *Telephone Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 607 (Tex. App.—Houston [1st Dist.] 2002, no pet.). An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *Butnaru*, 84 S.W.3d at 204. An adequate legal remedy is one that is as complete, practical, and efficient to the prompt administration of justice as is equitable relief. *Universal Health Servs.*, 24 S.W.3d at 577.

R & R Resources argues that the wells at issue have produced oil and gas in paying quantities under its operatorship, that it has made proportional distributions of this income each month, and that the audit of its financial records did not reveal any unpaid invoices, pollution, loss

11

of acreage, liens, or claims against the wells. But Echelon, Tex-El, and BairTex introduced evidence that R & R Resources was billing them for expenses incurred at least two months earlier, or expenses incurred in the same month as the billing, that their revenues were reduced by the amount of these untimely billings, and that R & R Resources delayed paying the expenses for several months despite its ability to pay them. There was evidence that the Goebel Brothers refund was not paid until seventeen months after the well was drilled, $100,000 of the Goebel Brothers well expenses were unpaid for ten months, revenue checks to some owners were dated weeks before they were mailed, and the audit of R & R Resources raised questions about whether certain bills were paid at all.

Mark Jaehne of Leexus testified that, although he received checks for his override interest from Doutel in three or four weeks from the time the check was "cut," Doutel was further behind because Doutel's check represented payment for the preceding month's production; it was not an advance payment. Jaehne explained that if Tex-On, an oil and gas gatherer, typically wired payment to Doutel on the 20th, but Doutel did not write a check to the interest owner until the 5th of the next month and did not mail it until three or four weeks after the date on that check, the interest owner would not be paid for production until sixty to seventy-five days after Doutel received payment. Jaehne also testified that he had a conversation with Tex-On about being paid directly, but Doutel would not allow Tex-On to make such direct payments.

Jaehne further testified that continual late payments may cause vendors to refuse to extend credit, charge higher prices, or refuse to provide services. He testified that R & R Resources's operational charges were excessive; that the price it received from the sale of salvage was too low; that it failed to install continuous chemical treating systems, the lack of which can

corrode equipment and affect production; and that it failed to adequately determine the need for replacement materials and equipment. Additionally, Snider testified that Leexus could do a better job, had more experience, more personnel, and a better location.

Slayton characterized Doutel's demeanor as,"I'm going to do it the way I'm going to do it and you can like it or dislike it." Slayton also testified that an investor on the Ullrich and Goebel Brothers wells resolved never to invest with Slayton again because the "operational bills were too high," and that vendors complained about the way their bills had been handled by R & R Resources. Doutel testified that he was "not concerned about what vendors think."

Ongoing and continuing harm resulting from an operator's refusal to relinquish operations is at least one basis for finding irreparable injury in support of a temporary injunction. *See Tri-Star Petroleum Co. v. Tipperary Corp.*, 101 S.W.3d 583, 591 (Tex. App.—El Paso 2003, pet. denied). Moreover, Echelon, Tex-El, and BairTex made claims for cloud on title and injury to real property, which do not require a showing that an adequate legal remedy is lacking to support an award of injunctive relief. *See* Tex. Civ. Prac. & Rem. Code Ann. § 65.011(4)-(5) (West 1997). The trial court's order found that Echelon, Tex-El, and BairTex would suffer injury for which there was no adequate remedy at law, noting that R & R Resources's improper accounting and operational practices

> have caused and will continue to cause loss and/or delay of revenue; payment of excessive and/or unnecessary lease/well expenses; late payment of lease/well expenses; exposure to lease/well creditors for non or late payment; the loss, interruption, and/or delay in production of valuable minerals; and the injury and/or damage to the well bores and/or equipment and materials located on the leases/wells.

13

The trial court also determined that the above damages would continue to occur so long as R & R Resources was operating the lease and that Echelon, Tex-El, and BairTex and their respective investors lacked an adequate legal remedy absent the issuance of the temporary injunction. The trial court was within its discretion to make such determinations based on the evidence before it. Furthermore, the court could have issued the temporary injunction without finding a lack of adequate legal remedy based on section 65.011 (4)-(5) of the Texas Civil Practice and Remedies Code. *See id.*

R & R Resources also argues that, although the operations for the three wells at issue have been conducted under the terms of the joint operating agreements for the Ullrich and Goebel Brothers wells, the court granted a temporary injunction as to only two of the three wells. Although the temporary injunction was inapplicable to the Toennis well, the record shows that, of the three wells in the underlying suit, the Toennis is the only well that is not expressly covered by a joint operating agreement. The court heard Benny Jaehne of Leexus testify that, because the Toennis does not have any operating agreement, if R & R Resources did not want to pay another bill it "would not be bound to anything." The trial court's findings state that, while the parties did not execute a joint operating agreement for the Toennis lease, R & R Resources argued without objection that the terms of the agreements for the Ullrich and Goebel Brothers leases applied to the Toennis lease by implication. Indulging every reasonable inference in favor of the court's order, we may infer that the trial court declined to include the Toennis well within the temporary injunction because it is not expressly covered by either of the two joint operating agreements. We overrule R & R Resources's second issue.

14

**Probable Right to the Relief Sought**

In its third issue, R & R Resources urges that the trial court abused its discretion in finding a "probable right of recovery" because Echelon, Tex-El, and BairTex did not obtain a finding of R & R Resources's gross negligence, willful misconduct, material breach, or total inability to perform. A probable right of success on the merits is shown by alleging a cause of action and presenting evidence that tends to sustain it. *Telephone Equip. Network, Inc.*, 80 S.W.3d at 607. The temporary injunction applicant is not required to establish that it will prevail on final trial. *Butnaru*, 84 S.W.3d 198, 211.

The relevant provisions in the joint operating agreements are found in the first two sections of article V.B.:

1. <u>Resignation or Removal of Operator</u>: Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A"[8] remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean

---

[8] The Non-Operators' ownership percentages shown in Exhibit "A" reflect the amounts that each owned before selling portions of their interests to investors. The parties stipulated to the testimony concerning BairTex's and Echelon's interests in the wells, although R & R Resources did not stipulate to the numbers.

not only gross negligence or willful misconduct but also the material breach of or inability to perform its obligations under this agreement.

Subject to Article VII.D.1,[9] such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non-Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.

2.  Selection of Successor Operator: Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.

The trial court found that Echelon, Tex-El, and BairTex had shown a probable right

of recovery because (i) Echelon, Tex-El, and BairTex—who were non-operators owning a majority

working interest under the joint operating agreements—affirmatively voted to remove R & R

---

[9] Article VII.D.1 permits the appointment of a new Operator "effective immediately" under certain circumstances. The parties do not contend that this provision is applicable to this case.

16

Resources as operator and to select Leexus as operator; (ii) R & R Resources's improper accounting and operation practices—which were a material breach of the standards of operation and/or inability to meet the standards of operation and a material failure or inability to perform obligations under the joint operating agreements—constituted "good cause" for its removal as operator; and (iii) R & R Resources violated article V.B.1-2 of the joint operating agreements by refusing to relinquish its operator status and transfer operations to Leexus after Leexus was selected and appointed as successor operator of all the wells.

Echelon, Tex-El, and BairTex's petition alleged that Leexus had a right to be the successor operator based on a majority vote. The evidence included a letter that Echelon, Tex-El, and BairTex's counsel wrote to Doutel on April 30, 2004, advising that his clients had voted to remove R & R Resources as operator for "good cause" pursuant to the joint operating agreements' terms. The letter listed the ways in which R & R Resources had "failed and refused to act as a reasonably prudent operator" and demanded that R & R Resources relinquish operation of the wells. Doutel's May 28 response letter denied the request to relinquish operation of the wells.

R & R Resources urges that the trial court should have applied a gross negligence standard. But the first paragraph of article V.B. in the joint operating agreements clarifies that good cause for an operator's removal "shall mean not only gross negligence or willful misconduct but also the material breach of or inability to perform its obligations under this agreement." Furthermore, R & R Resources does not cite any authority supporting application of an exculpatory clause that concerns the manner in which an operator conducts drilling operations, as in article V.A. of these joint operating agreements, to equitable claims that do not involve R & R Resources's "liability" for

17

damages, or to claims for damages that are not based on drilling operations. *See Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 759 (Tex. App.—El Paso 2000, no pet.); *see also Cone v. Fagadau Energy Corp.*, 68 S.W.3d 147, 155 (Tex. App.—Eastland 2001, pet. denied).

R & R Resources's alternative argument that the evidence in the record fails to support its removal as operator for "failing or refusing to carry out its duties" is not persuasive. Failure to make prompt adjustments to an operating account and improperly assessed charges—similar to the allegations in this case—have been bases for finding that an operator "failed or refused to carry out its duties," which would support the entry of a temporary injunction. *See Tri-Star Petroleum Co.*, 101 S.W.3d at 589-90. Reviewing the evidence in the light most favorable to the trial court's order, we cannot conclude the trial court abused its discretion in finding that Echelon, Tex-El, and BairTex established a probable right of recovery in support of their request for temporary injunction. We overrule R & R Resources's third issue.

**Violations of Equity**

In its final issue, R & R Resources claims that the trial court's temporary injunction violated the rules of equity because Echelon, Tex-El, and BairTex materially breached the notice and removal provisions of the joint operating agreements and thus did not have "clean hands" when they sought equitable relief. The evidence adduced at the hearing does not support this contention. On April 30, 2004, Echelon, Tex-El, and BairTex gave R & R Resources formal notice of the ways in which it had "failed and refused to act as a reasonably prudent operator." Doutel's May 28 response letter did not address the majority of the other allegations in counsel's letter. Almost four months

18

after sending its demand letter, the Non-Operators requested the assistance of the Texas Railroad Commission via single-signature P-4s. That request was denied on November 19, 2004. The Non-Operators did not seek an injunction against R & R Resources until May 18, 2005, when they filed suit. R & R Resources's argument that it did not have thirty days to cure the Non-Operators' complaints is not persuasive. Similarly, its arguments that it did not have written notice of the accounting discrepancies or receive a copy of the audit prior to the lawsuit are not persuasive because they are not prerequisites to filing suit under the terms of the joint operating agreements.

R & R Resources's final argument is that the trial court's temporary injunction violated the rules of equity because the temporary relief requested was identical to the permanent relief requested. It claims that the Non-Operators' temporary injunction effectively accomplished the entire purpose of their lawsuit and made the court's order a ruling on the merits of whether R & R Resources should be removed as operator. A ruling on temporary injunctive relief may not be used to obtain an advance ruling on the merits. *See Iranian Muslim Org. v. City of San Antonio*, 615 S.W.2d 202, 208 (Tex. 1981). But Echelon, Tex-El, and BairTex did not receive all the relief requested in their motion for temporary injunction or in their petition. The temporary injunction does not cover the Toennis well. Additionally, the petition makes claims for damages based on breach of contract and cloud on the title. Thus, the trial court did not grant relief identical to that which the Non-Operators sought in their lawsuit by issuing the temporary injunction concerning the Ullrich and Goebel Brothers wells. We overrule R & R Resources's fourth issue.

19

**Opportunity to be Heard at Subsequent Status Hearing**

In its fifth issue, R & R Resources urges that it was denied an opportunity to be heard at a subsequent status hearing on September 5, 2005. R & R Resources argues that it should have been able to present additional evidence on the issues of authority and irreparable injury. The court had previously scheduled the status hearing to determine whether its temporary injunction order was being followed, not as a continuation of the two-day temporary injunction hearing held in June. We have found that the court had some evidence to support its findings on the issue of authority—as noted in the earlier discussion of the Non-Operators' standing to seek the temporary injunction—and irreparable injury. We also note that the court agreed to conduct an *in camera* inspection on November 4, 2005, to address the issue of Echelon, Tex-El, and BairTex's authority, thus R & R Resources had an additional opportunity to raise this issue with the trial court. We overrule R & R Resources's fifth issue.

**Impermissibly Speculative Order**

R & R Resources's sixth issue argues that the trial court's order was impermissibly speculative because it did not make findings of gross negligence or willful misconduct on the part of R & R Resources and that its findings on irreparable injury are not supported by the evidence. We previously noted that article V.B.1 in these joint operating agreements states that "good cause" for an operator's removal includes the operator's "material breach of or inability to perform its obligations under th[e] agreement[s]" and found that the trial court had some evidence to support its finding that R & R Resources "failed or refused to carry out its duties" to support the entry of a

20

temporary injunction. We also found that ongoing and continuing harm resulting from an operator's refusal to relinquish operations is at least one basis for finding irreparable injury in support of a temporary injunction. We overrule R & R Resources's sixth issue.

## CONCLUSION

Based on the record before us, R & R Resources has not shown that the district court acted outside the bounds of reasonable discretion by granting the temporary injunction. Accordingly, we affirm the court's order.

_____

Jan P. Patterson, Justice

Before Justices B. A. Smith, Patterson and Puryear

Affirmed

Filed:   January 10, 2006